UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

BYBEE FARMS, LLC, et al.,

          Plaintiffs,

       v.

SNAKE RIVER SUGAR COMPANY, et al.,

          Defendants.

No. CV-06-5007-FVS

TENTATIVE CONCLUSIONS RE PLAINTIFFS' FIRST, SECOND, AND EIGHTH CLAIMS

**THIS MATTER** comes before the Court based upon the defendants' motion for summary judgment.  They are represented by J. Walter Sinclair; the plaintiffs by Thomas Banducci.  The following are the Court's tentative conclusions regarding the plaintiffs' first, second, and eighth claims.

**BACKGROUND**

The Snake River Sugar Company ("SRSC") is an agricultural cooperative.  Its members are sugarbeet growers in the States of Idaho, Washington, and Oregon.  Each year, the SRSC purchases sugarbeets from its growers and sells them to The Amalgamated Sugar Company ("TASCO").  The latter processes the beets and sells the refined sugar.  Any profit is divided among SRSC members.

A sugarbeet grower becomes a member of the SRSC by signing at least two contracts.  One is entitled "Subscription Agreement"; the

TENTATIVE CONCLUSIONS - 1

other is entitled "Grower Agreement."  The Subscription Agreement is a contract to purchase stock in the SRSC.  A grower purchases one share of common stock and multiple shares of patron preferred stock.  The Grower Agreement is a contract to grow and deliver sugarbeets.  A grower has both a right and a responsibility to produce beets.  The number of acres he is entitled/obligated to cultivate is based upon the number of shares of patron preferred stock that he holds.

The SRSC is divided into separate geographical districts.  One of them is the Washington district.  The following SRSC members grow sugarbeets in the State of Washington:  Bybee Farms LLC, Duane Munn & Sons Farms LLC, Neal Bybee, Brent Schulthies Farms LLC, Brent Hartley Farms LLC, and R. Munn Farms LLC.  They have formed a partnership named Sunheaven Farms.  The purpose of the partnership is to provide a common irrigation system for their farms.  David R. Walker is the manager of Sunheaven Farms.  Besides managing the partnership, he also sits on the SRSC's board of directors.

Sugarbeets grown by SRSC members must be transported to TASCO processing plants.  The freight rates for transporting sugarbeets grown in the Washington district are among the highest in the cooperative.  The SRSC was willing to accept this circumstance as long as TASCO could profitably process the growers' sugarbeets and sell the refined sugar. By 2004, that was no longer the case.  Not only was TASCO prohibited by federal regulation from selling all of the sugar that it refined (which created an enormous surplus), but the price of sugar dropped precipitously.

TENTATIVE CONCLUSIONS - 2

During December of 2004, Mr. Walker arranged a meeting between the partners of Sunheaven Farms and Ralph Burton, who was the president of the SRSC and the president and CEO of TASCO. The meeting occurred in the State of Washington on January 5, 2005. Mr. Burton allegedly said that TASCO was refining more sugar than it could sell profitably. According to Clyde Bybee, one of the persons who was present at the meeting, Mr. Burton said that the SRSC intended to "collapse" the Washington district within three years in order to save money. Mr. Bybee recalls Mr. Burton saying that the SRSC might make the Sunheaven Farms partners pay for services that the cooperative was now providing at no cost. Mr. Bybee thought he understood what Mr. Burton meant. In the next few years, the SRSC was going to make it prohibitively expensive for them to grow sugarbeets. There was an alternative, said Mr. Burton. He allegedly asked the partners to cease growing sugarbeets and sell their shares of stock to the SRSC. Not only that, but also he allegedly indicated that their shares of patron preferred stock were worth $800.00 per share.

The Sunheaven Farms partners knew that Mr. Burton had significant influence with the directors. He was, in the words of Mr. Walker, "someone that could get things done." The partners assumed that his request had the tacit, if not the express, approval of the executive committee of the SRSC's board of directors. Thus, on January 17th, they submitted a memorandum to the executive committee. Two partners said they intended to grow sugarbeets during 2005, but would be willing to sell their shares after three years if the Washington

TENTATIVE CONCLUSIONS - 3

district was going to be "collapsed."  Three other partners said they were presently willing to sell their shares for $1000.00 per share, but would grow sugarbeets during 2005 if the executive committee rejected their offers.

On January 24th, Mr. Burton sent a three-paragraph email to Mr. Walker in which he alluded to the growers' respective offers.  The last paragraph of Mr. Burton's email states, "I don't have anything definitive and may not for a while.  This of course argues that this may be a next year deal."  Mr. Walker printed the email and jotted a note on it before providing copies to the partners of Sunheaven Farms. "Thought you might be interested in Ralph's comments," he advised the partners.  "Getting $1,000 per share will not be slam dunk."

On February 17th, the executive committee held a meeting by means of a telephone conference call.  Participants discussed the offers made by the Sunheaven Farms partners and decided they were unacceptable.  Although Mr. Burton participated in the call, and although he was aware of the executive committee's decision, he did not inform the Sunheaven Farms partners that their offers had been rejected.

Duane Munn & Sons Farms LLC was one of the growers who submitted an offer to sell.  Brandon Munn is one of Duane's sons.  Brandon is actively involved in the operation of Duane Munn & Sons Farms LLC. While he knew that his family had made a decision not to plant sugarbeets in 2005, and while he believed that "a deal was in progress," the absence of a response from the executive committee made

TENTATIVE CONCLUSIONS - 4

him anxious.  His anxiety was justified.  Paragraphs 7 and 8 of the Grower Agreement establish penalties in the event a member fails to fulfill his contractual obligations.  Paragraph 7 states that a delinquent grower must compensate the SRSC for the value of the sugarbeets he fails to deliver.[1]  The parties typically refer to this as a "make-whole payment."  Paragraph 8 states that if he fails to timely compensate the SRSC, his shares of Patron Preferred Stock are forfeited to the SRSC.[2]

Brandon Munn may not have know the precise terms of Paragraphs 7 and 8, but he knew that his family's decision not to plant sugarbeets could result in severe penalties.  Consequently, he repeatedly questioned Vic Jaro, SRSC's Vice President of Agriculture, about the

---

[1]Paragraph 7 is entitled "Failure to Plant, Replant or Deliver Sugarbeets."  It states in part:
> In the event Grower does not meet any of the obligations specified in paragraph 5, . . . Grower agrees to pay to the Cooperative a cash sum based upon the LLC's most current projection of the resulting decrease in the LLC's distributable cash as defined in the LLC's Company Agreement, computed on a per acre basis ("Distributable Cash Per Acre Decrease").

[2]Paragraph 8 is entitled "Agreement to Pay Distributable Cash Per Acre Decrease or the Reversion of Shares."  It states in part:
> . . .  In the event Grower does not pay the Distributable Cash Per Acre Decrease within said time period, Grower agrees that Grower's Patron Preferred Stock in an amount equivalent to the number of acres to which said payment failure applies shall immediately revert and transfer to the Cooperative without any further action of Grower.

TENTATIVE CONCLUSIONS - 5

contractual ramifications of his family's decision not to plant sugar
beets during 2005:

> In the end, . . . I asked him, if we don't grow these
> sugarbeets, which we're not planning on doing, will it look
> negatively on us if this buyout doesn't happen until later,
> and he says nope, it won't look negatively, we know the
> buyout's in progress, just because it's not finalized today
> doesn't mean you'll be penalized later.

If that's what Mr. Jaro said, he misstated the actual state of
affairs.  As far as the executive committee was concerned, there was
no buyout in progress.

During the Fall of 2005, Duane Munn & Sons Farms LLC and Bybee
Farms LLC retained counsel, who began negotiating with the SRSC.
Fearing that the SRSC intended to invoke the penalty provisions
contained in the Grower Agreement, those two growers and a third
company filed this action on January 26, 2006.  Negotiations continued
thereafter, but the parties were unable to resolve their differences.
On June 4, 2007, the plaintiffs filed a second amended complaint.  The
defendants have filed an answer that denies liability and asserts
counterclaims.  The parties have filed cross-motions for summary
judgment.  Three of the plaintiffs' claims are discussed herein.[3]

**MR. BURTON'S AUTHORITY**

Mr. Burton was the SRSC's agent at all times relevant to this
action.  In Washington, "[a]n agent can bind [his] principal to a

---

[3]The parties agree that the plaintiffs' claims of promissory
estoppel and unjust enrichment are governed by the law of the
State of Washington.

TENTATIVE CONCLUSIONS - 6

contract when the agent has either actual or apparent authority." *See Hoglund v. Meeks*, 139 Wn. App. 854, 866, 170 P.3d 37 (2007). Mr. Burton did not have actual authority to offer to purchase the plaintiffs' shares of stock if they ceased growing sugarbeets. Thus, the plaintiffs must prove that he had apparent authority to do so. "Whether an agent has apparent authority to make a contract depends upon the circumstances and is to be decided by the trier of fact." *State of Washington v. French*, 88 Wn. App. 586, 595, 945 P.2d 752 (1997) (internal punctuation and citations omitted)). Summary judgment is warranted only where "the evidence presented by both sides would permit the trier of fact to come to only one conclusion." *Japan Telecom, Inc. v. Japan Telecom Am.*, Inc., 287 F.3d 866, 871 (9th Cir.2002).

   "An agent's apparent authority to bind a principal depends upon the objective manifestations of the principal to a third person." *Id*. A principal may communicate objective manifestations of authority to a third person by word or by deed. *See Hoglund*, 139 Wn. App. at 869-70. By itself, however, a principal's communication of objective manifestations of authority is not enough to cloak an agent with the principal's authority. More is required. Not only must the principal's objective manifestations "cause the one claiming apparent authority to actually, or subjectively, believe that the agent has authority to act for the principal," *Udall v. T.D. Escrow Services, Inc.*, 159 Wn.2d 903, 913, 154 P.3d 882 (2007), but also "the claimant's actual, subjective belief [must be] objectively

TENTATIVE CONCLUSIONS - 7

reasonable." *Id.* (internal punctuation and citation omitted).

One of the ways in which a principal may cloak an agent with apparent authority is "'by appointing [him] to a position, such as that of manager or treasurer, which carries with it generally recognized duties; to those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position[.]'" *Smith v. Hansen, Hansen & Johnson, Inc.*, 63 Wn. App. 355, 365, 818 P.2d 1127 (1991) (quoting *Restatement (Second) of Agency* § 27 cmt. a, at 104 (1958)), *review denied*, 118 Wn.2d 1023 (1992). The SRSC employed Mr. Burton as its president. The plaintiffs knew that. They also knew that he had asked to speak to them in his official capacity and that he was someone who "could get things done" (*i.e.*, he wielded considerable influence within the SRSC). In view of these circumstances, a rational jury would have no trouble finding that they subjectively believed Mr. Burton was speaking with the approval of the SRSC when he asked them to cease growing sugarbeets and sell their shares.

The more difficult issue is whether a rational jury could also find that the plaintiffs' subjective perception of Mr. Burton's authority was objectively reasonable. The plaintiffs were receiving advice from David Walker, who was the manager of Sunheaven Farms and a member of the SRSC's board of directors. During his deposition, Mr. Walker acknowledged that he could think of no SRSC officer or employee who was authorized to purchase a grower's shares without board approval. To the contrary, he assumed that board approval would be

TENTATIVE CONCLUSIONS - 8

required.  Despite his awareness of this limitation on Mr. Burton's authority as president, neither Mr. Walker nor any of the plaintiffs attempted to ascertain whether Mr. Burton was speaking for the board when he allegedly offered to purchase their shares of stock.  The absence of any inquiry on the plaintiffs' part undermines their position.  "If a person has been put on notice of limitations of an agent's authority, the person has a duty to inquire into the limitations, and if he fails to do this, he will be deemed to have actual knowledge of the agent's lack of authority."  *Stroud v. Beck*, 49 Wn. App. 279, 285, 742 P.2d 735 (1987).  Were a rational jury instructed to evaluate the facts of this case in light of the preceding rule, it would be unable to find that the plaintiffs' perceptions of Mr. Burton's authority were objectively reasonable.

**OFFER/COUNTEROFFER**

The plaintiffs allege that Mr. Burton made essentially the following statement on January 5, 2005.  "If you will cease growing sugarbeets, the SRSC will purchase your shares of patron preferred stock at a reasonable price.[4]"  That is to say, Mr. Burton allegedly offered the plaintiffs a promise (the SRSC will purchase your shares of patron preferred stock) in exchange for a forbearance on the plaintiffs' part (if you will cease growing sugarbeets).  By allegedly making this offer, Mr. Burton laid the foundation for unilateral

---

[4]The plaintiffs allege that this was the substance of Mr. Burton's offer, not that he expressed himself as directly as the quotation marks imply.

TENTATIVE CONCLUSIONS - 9

contracts. *Browning v. Johnson*, 70 Wn.2d 145, 147, 148, 422 P.2d 314 (1967) ("A unilateral contract is one in which a promise is given in exchange for an act or forbearance."). *See also* 25 David K. DeWolf et al., *Washington Practice, Contract Law and Practice* § 1:4, at 7-9 (2007).

Mr. Burton may have laid the foundation for unilateral contracts, but enforceable contracts did not arise on January 5th. Indeed, contracts could not arise until the plaintiffs refrained from planting sugarbeets. Only by providing the forbearance requested by Mr. Burton could the plaintiffs accept his alleged offer to purchase their shares of patron preferred stock. *See Multicare Med. Center v. State, Dep't of Soc. & Servs.*, 114 Wn.2d 572, 584, 790 P.2d 124 (1990) ("under a unilateral contract, an offer cannot be accepted by promising to perform; rather, the offeree must accept, if at all, by performance, and the contract then becomes executed" (citing *Cook v. Johnson*, 37 Wn.2d 19, 23, 221 P.2d 525 (1950))). Furthermore, the putative parties to the contracts had not agreed upon the value of the plaintiffs' respective shares. *Cf. Kloss v. Honeywell*, 77 Wn. App. 294, 298, 890 P.2d 480 (1995) (as a general rule, "price" is one of the essential elements of a contract). Mr. Burton allegedly told the plaintiffs that he thought their patron preferred stock was worth $800.00 per share. They thought their stock was worth more than that. In order to obtain a better price, they demanded $1000.00 per share and threatened to plant sugarbeets during 2005 unless the SRSC assented.

TENTATIVE CONCLUSIONS - 10

The plaintiffs never intended to carry out the threat.  To the contrary, it was a "bargaining chip."  They had decided to  accept Mr. Burton's alleged offer and sell their shares of patron preferred stock to the SRSC.  Nevertheless, by conditioning a sale upon the SRSC's assent to the price that they named, they effectively rejected Mr. Burton's alleged offer.  *See Rorvig v. Douglas*, 123 Wn.2d 854, 858, 873 P.2d 492 (1994) ("an acceptance that requests modification of terms may consummate a contract unless the additional terms are conditions of acceptance" (citing *Restatement (Second) of Contracts* § 61 (1981))).[5]  At most, the plaintiffs made counteroffers.  *See Blue Mountain Constr. Co. v. Grant County Sch. Dist. No. 150-204*, 49 Wn.2d 685, 688, 306 P.2d 209 (1957) ("An expression of assent that changes the terms of the offer in any material respect may be operative as a counteroffer; but it is not an acceptance and consummates no contract.").

The executive committee did not respond to the plaintiffs' memorandum of January 17th.  Assuming, for purposes of argument, that the plaintiffs' memorandum set forth counteroffers, the executive committee's silence did not amount to acceptance unless the executive committee had a duty to inform the plaintiffs of its decision.  *See Saluteen-Maschersky v. Countrywide Funding Corp.*, 105 Wn. App. 846,

---

[5]Section 61 states:
An acceptance which requests a change or addition to the terms of the offer is not thereby invalidated unless the acceptance is made to depend on an assent to the changed or added terms.

TENTATIVE CONCLUSIONS - 11

853, 22 P.3d 804 (2001).  "Acceptance by silence is exceptional."
*Restatement (Second) of Contracts* § 69, cmt. a (1981).  Typically, a
duty to speak arises in two classes of cases:  "those where the
offeree silently takes offered benefits, and those where one party
relies on the other party's manifestation of intention that silence
may operate as acceptance."  *Id.* cmt. b.  This case does not fall into
either class.  The SRSC did not accept services from the plaintiffs.
*Cf. Hoglund*, 139 Wn. App. at 872 (an attorney's silence constituted
acceptance of a fee-splitting agreement where she continued to accept
the other attorney's legal services and "repeatedly promised to work
out the specific terms of a written memorialization of their
agreement").  Nor did the plaintiffs ever say to the SRSC that they
would construe its silence as acceptance.[6]  As a result, the executive
committee's failure to inform the plaintiffs of its decision did not
constitute acceptance of their respective counteroffers.

### RELIANCE UPON RALPH BURTON'S ALLEGED PROMISE

Despite the fact that they rejected Mr. Burton's alleged offer by
making counteroffers, and despite the fact that the SRSC never
accepted their counteroffers or offered new terms, the plaintiffs
furnished the forbearance allegedly requested by Mr. Burton.  However,
they do not allege that their forbearance -- ceasing to grow
sugarbeets -- created unilateral contracts with the SRSC.  *Cf. Knight
v. Seattle First Nat'l Bank*, 22 Wn. App. 493, 496, 589 P.2d 1279

---

[6]Not that such a statement would have bound the SRSC.
*Restatement, supra,* § 69, cmt. c.

TENTATIVE CONCLUSIONS - 12

(1979) ("part performance by the offeree may preclude withdrawal of the offer").  Instead, they seek to invoke the doctrine of promissory estoppel.

"The purpose of promissory estoppel is '"'to make a promise binding, under certain circumstances, without consideration in the usual sense of something bargained for and given in exchange.'"'" *Greaves v. Medical Imaging Sys., Inc.*, 124 Wn.2d 389, 398, 879 P.2d 276 (1994) (quoting *Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 261 n.4, 616 P.2d 644 (1980) (quoting *Raedeke v. Gibraltar Savings & Loan Ass'n*, 10 Cal.3d 665, 672-73, 111 Cal.Rptr. 693, 517 P.2d 1157 (1974) (quoting *Youngman v. Nevada Irrigation Dist.*, 70 Cal.2d 240, 249, 74 Cal.Rptr. 398, 449 P.2d 462 (1969)))).  In order to prevail, the plaintiffs must prove the existence of "(1) [a] promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise."  *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 539, 424 P.2d 290 (1967) (citing Restatement of Contracts § 90 (1932)).

The plaintiffs allege that Mr. Burton promised them that the SRSC would purchase their shares of patron preferred stock at a reasonable price if they ceased growing sugarbeets.  The plaintiffs further allege that they ceased growing sugarbeets -- *i.e.*, they changed position -- in reliance upon his alleged promise.  The plaintiffs' change of position was a type of forbearance.  Black's Law Dictionary

(8th ed.2004) (defining forbearance as "refraining from enforcing a right"). Moreover, their forbearance was bargained for. Mr. Burton sought it in exchange for his alleged promise, and the plaintiffs gave it in exchange for his promise. *Restatement, supra,* § 71(2) (a forbearance "is bargained for if it is sought by the promisor [here, Mr. Burton] in exchange for his promise and is given by the promisee [here, the plaintiffs] in exchange for that promise").[7]

The plaintiffs suffered a detriment as a result of their forbearance. They gave up both the contractual right to grow sugarbeets and the satisfaction and income they had derived from doing so. *See Browning v. Johnson*, 70 Wn.2d 145, 148, 422 P.2d 314 (1967) (detriment means "giving up of 'something which immediately prior thereto the promisee was privileged to retain'" (quoting 1 *Williston on Contracts* § 102A, at 382 (3rd ed.1957))). And by ceasing sugarbeet production, they arguably conferred a benefit upon the SRSC. Without question, they gave the SRSC something that Mr. Burton actively sought; something he thought would benefit the SRSC as a whole. He may have been proved incorrect by subsequent events, but during January of 2005, he was convinced that reduced sugarbeet production was essential to the financial health of the SRSC.

The fact that the plaintiffs provided the SRSC with a forbearance that was bargained for -- a forbearance that resulted in detriment to the plaintiffs -- means that the plaintiffs' forbearance constituted

[7]The Washington Supreme Court adopted § 71 in *Labriola v. Pollard Group, Inc.*, 152 Wn.2d 828, 833-34, 100 P.2d 791 (2004).

TENTATIVE CONCLUSIONS - 14

consideration for Mr. Burton's alleged promise.  *See Vehicle/Vessel, LLC v. Whitman County*, 122 Wn. App. 770, 778, 95 P.3d 394 (2004) ("[c]onsideration for a unilateral contract consists of the offeree's performance of the required terms" (citing *Multicare Med. Center*, 114 Wn.2d at 584)).  Which produces a surprising outcome.  The existence of consideration is fatal to the plaintiffs' promissory estoppel claim.  "If the promisee's performance [here, the plaintiffs' forbearance] was requested at the time the promisor made his promise [here, Mr. Burton's alleged promise regarding the SRSC's purchase of their stock] and that performance was bargained for, the doctrine [of promissory estoppel] is inapplicable."  *Greaves*, 124 Wn.2d at 398 (internal quotation marks and citations omitted).  *See also* 3 Eric Mills Holmes, *Corbin on Contracts* § 8.12, at 79-80 (rev. ed.1996) ("the doctrine [of promissory estoppel] is inapplicable as a matter of law when all the promises made are bargained for and supported by consideration").  It follows that the plaintiffs' reliance upon the doctrine of promissory estoppel is misplaced.  They must look to other principles of law for relief.[8]

---

[8]The Supreme Court of the State of California says that "'the law of consideration'" applies.  *Youngman v. Nevada Irrigation Dist.*, 70 Cal.2d 240, 249, 74 Cal.Rptr. 398, 404, 449 P.2d 462 (1969) (quoting *Healy v. Brewster*, 59 Cal.2d 455, 463, 30 Cal.Rptr. 129, 133, 380 P.2d 817 (1963)).  *See also* 3 E. Holmes, *supra* § 8.12, at 80 ("[w]hen a promisee's conduct in reliance is bargained for, the law of consideration is triggered").  Although the Washington Supreme Court has cited *Youngman* with approval, *Klinke*, 94 Wn.2d at 261 n.4, it has never employed the phrase "the law of consideration" in a context that

Even if the doctrine of promissory estoppel is applicable, the defendants are entitled to summary judgment because the plaintiffs cannot prove all of the elements necessary to prevail. As noted above, a person seeking relief under the doctrine of promissory estoppel must establish the existence of a promise. *King v. Riveland*, 125 Wn.2d 500, 506, 886 P.2d 160 (1994). An unauthorized commitment on the part of an agent does not satisfy this requirement. *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 539, 424 P.2d 290 (1967). Since a jury would be unable to find that Mr. Burton possessed apparent authority to bind the SRSC with respect to the purchase of the plaintiffs' shares of patron preferred stock, the plaintiffs' promissory estoppel claim cannot succeed to the extent it is grounded upon the promise that he allegedly made to the plaintiffs on January 5, 2005.

**RELIANCE UPON VIC JARO'S ALLEGED PROMISE**

Mr. Jaro is the SRSC's Vice President of Agriculture. During the Winter or Spring of 2005, he allegedly told Brandon Munn that his family's failure to plant sugarbeets "won't look negatively[.] [W]e know the buyout's in progress[;] just because it's not finalized today doesn't mean you'll be penalized later." Since Mr. Jaro did not ask anything of Brandon in exchange for his alleged promise, nor did Brandon offer anything to Mr. Jaro beyond the forbearance already provided, Mr. Jaro's alleged promise can sustain a promissory estoppel claim. Furthermore, genuine issues of material fact exist. Given the record as it now stands, a rational fact-finder could make the

---

is related to this one.

TENTATIVE CONCLUSIONS - 16

following determinations:  Brandon Munn reasonably thought that Mr. Jaro was authorized to speak for the board of directors with respect to whether the SRSC intended to invoke the contractual penalties available under paragraphs 7 and 8 of the Grower Agreement; Mr. Jaro's comments constituted a promise that the SRSC would not invoke the contractual penalties as a result of the Munn Family's failure to plant sugarbeets during the Spring of 2005; and the Munn family reasonably relied upon Mr. Jaro's promise.  Based upon these determinations, the Court could decide that it would be unjust to allow the SRSC to escape responsibility for Mr. Jaro's alleged promise.  That being the case, the SRSC is not entitled to summary judgment on this issue as far as Duane Munn & Sons Farms LLC is concerned.[9]

**UNJUST ENRICHMENT**

The plaintiffs allege that the SRSC has obtained substantial financial benefits because they refrained from growing sugarbeets at Mr. Burton's request.  For one thing, the SRSC's surplus of sugarbeets has been reduced.  For another, the SRSC has avoided paying freight costs.  Finally, the SRSC has obtained, or will obtain, their shares of patron preferred stock without paying for them.  While the plaintiffs allege that the SRSC obtained these benefits because they refrained from growing sugarbeets, the plaintiffs do not allege that

---

[9]Brandon Munn did not communicate Mr. Jaro's alleged comments to the other plaintiffs.  Consequently, they may not rely upon them.

TENTATIVE CONCLUSIONS - 17

the Court could find from the facts of this case that the SRSC implicitly contracted to pay for these benefits. *See Chandler v. Washington Toll Bridge Auth.*, 17 Wn.2d 591, 600, 137 P.2d 97 (1943) ("[c]ontracts implied in fact arise from . . . circumstances showing a mutual consent and intention to contract"). Rather, the plaintiffs urge the Court to impose upon the SRSC a legal duty to pay for them. Put somewhat differently, the plaintiffs urge the Court to imply the existence of a contract as a matter of law. *See id.* at 600-01 ("'[a] contract implied in law is an obligation imposed upon a person by the law, not in pursuance of his intention and agreement, either express or implied, but found against his will and design, because the circumstances between the parties are such as to render it just that one should have a right and the other a corresponding liability similar to that which would arise from a contract between them'" (quoting *Byram v. Thurston County*, 141 Wash. 28, 39, 251 P. 103, 252 P. 943 (1926))). According to the plaintiffs, failure to find the existence of a quasi contract will result in the unjust enrichment of the SRSC. *See Lynch v. Deaconess Medical Center*, 113 Wn.2d 162, 165, 776 P.2d 681 (1989) ("[q]uasi contracts are founded on the equitable principle of unjust enrichment which simply states that one should not be 'unjustly enriched at the expense of another'" (quoting *Milone & Tucci, Inc. v. Bona Fide Builders, Inc.*, 49 Wn.2d 363, 367, 301 P.2d 759 (1956))).

The plaintiffs' unjust enrichment claim faces a formidable obstacle. Each of the benefits described above -- *i.e.*, reduced

TENTATIVE CONCLUSIONS - 18

production of sugarbeets, reduced freight costs, and forfeiture of stock -- is addressed by an express contract:  either a Grower Agreement, an Annual Planting Contract, or both.[10]  These express contracts govern the parties' rights and responsibilities with respect to sugarbeet production, allocation of freight costs, and stock forfeiture.  When a party is bound by the provisions of a valid, express contract, he "may not disregard the same and bring an action on an implied contract relating to the same matter, in contravention of the express contract."  *Chandler*, 17 Wn.2d at 604.  Thus, the plaintiffs may not bring an unjust enrichment claim based upon the windfall that the SRSC allegedly has reaped.

**AGRICULTURAL FAIR PRACTICES ACT**

The defendants concede that the plaintiffs are "engaged in the production of agricultural products" within the meaning of the Agricultural Fair Practices Act ("AFPA").  Hence, the plaintiffs qualify as AFPA "producers."  7 U.S.C. § 2302(b).  The defendants further concede that they acquire and process agricultural products from the plaintiffs.  Hence, the defendants qualify as AFPA "handlers."  7 U.S.C. § 2302(a)(1),(2).  The AFPA makes it unlawful for handlers to knowingly "coerce any producer in the exercise of his right to . . . belong to . . . an association of producers," 7 U.S.C.

---

[10]Paragraph 1(a) of the Grower Agreement states in part, "The Grower agrees to enter into an Annual Planting Contract with the Cooperative setting forth the acres to be grown and the description of the land on which said sugarbeets will be grown[.]"

TENTATIVE CONCLUSIONS - 19

§ 2303(a), or to knowingly "coerce or intimidate any producer to . . . cancel, or terminate a membership in or contract with an association of producers[.]" 7 U.S.C. § 2303(c). The plaintiffs allege that Mr. Burton coerced them into relinquishing their respective memberships in the cooperative by threatening to make it unprofitable for them to grow sugarbeets.

The AFPA does not define the term "coerce." As a result, the Court must give the word its ordinary and natural meaning. *See United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 689 (9th Cir.2006). The Court may determine a word's ordinary and natural meaning by consulting a dictionary. *Id.* Typically, the word "coerce" is defined to mean "compel by force or threat." Black's Law Dictionary (8th ed.2004). The Court may assume that Congress had this definition, or something similar, in mind when it enacted the AFPA. The issue, then, is whether Mr. Burton's alleged statements were so threatening that objective listeners in the plaintiffs' position reasonably would have felt compelled to cease growing sugarbeets.

The plaintiffs rely exclusively upon Mr. Burton's alleged statements on January 5, 2005. On that date, he allegedly told the partners of Sunheaven Farms that the SRSC intended to "collapse" the Washington district within three years. This might be accomplished, suggested Mr. Burton, by requiring them to pay for services that were then provided by the cooperative at no cost. The plaintiffs contend that they were "shocked" and "devastated" by Mr. Burton's statements;

a contention that a rational jury easily could accept.  Moreover, a
rational jury could find that the Sunheaven Farms partners felt
pressured by Mr. Burton's alleged statements.  But pressure is not the
same as coercion.  A rational jury would be unable to find that Mr.
Burton's alleged statements constituted coercion within the meaning of
the AFPA.  To begin with, two of the Sunheaven Farms partners decided
to continue growing sugarbeets despite the pressure applied by Mr.
Burton.  Perhaps this was because the change in policy he described --
*i.e.,* requiring them to pay for services that were then provided by
the cooperative -- was neither imminent nor certain.  At the earliest,
the policy change was three years away.  Not only that, it would
require approval by the board of directors.  The plaintiffs were
represented on the board by Mr. Walker.  They knew or should have
known that they would be entitled to object to any proposed change in
policy, and to suggest alternatives that would enable them to continue
growing sugarbeets.  In view of the preceding circumstances, an
objective person in the plaintiffs' position would have been unable to
conclude during the Winter of 2005 but that he had no choice but to
cease growing sugarbeets.

**SUMMARY**

1. The Court is inclined to grant the defendants' motion for
summary judgment with respect to the promissory estoppel claim
asserted by Bybee Farms LLC.

2. The Court is **not** inclined to grant the defendants' motion for
summary judgment with respect to the promissory estoppel claim

asserted by Duane Munn & Sons Farms LLC to the extent that this plaintiff alleges that it reasonably relied upon the representations of Vic Jaro.

3. The Court is inclined to grant the defendants' motion for summary judgment with respect to the plaintiffs' unjust enrichment claims.

4. The Court is inclined to grant the defendants' motion for summary judgment with respect to the plaintiffs' AFPA claims.

5. Oral argument will be scheduled in due course.

**CONCLUSIONS ARE TENTATIVE**

The conclusions set forth above are tentative.  After listening to oral argument, the Court may modify or abandon some or all of them. Since this is not an order, the Court will not consider a motion for reconsideration.  Nor will the Court consider supplemental evidence or memoranda.  The record is complete for purposes of dispositive motions.

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to enter the Court's tentative conclusions and furnish copies to counsel.

**DATED** this ___10th___ day of June, 2008.

                    s/ Fred Van Sickle
                    Fred Van Sickle
          Senior United States District Judge