UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

BYBEE FARMS LLC, et al.,

              Plaintiffs,

        v.

SNAKE RIVER SUGAR COMPANY, et
al.,

            Defendants.

No. CV-06-5007-FVS

TENTATIVE CONCLUSIONS RE
PLAINTIFFS' THIRD CAUSE
OF ACTION

**THIS MATTER** comes before the Court based upon the defendants'
motion for summary judgment.  They are represented by J. Walter
Sinclair.  The plaintiffs are represented by Thomas Banducci.  The
following are the Court's tentative conclusions regarding the
plaintiffs' third cause of action.

      **BACKGROUND**

Each of the plaintiffs -- Bybee Farms LLC, Duane Munn & Sons
Farms LLC, and Neal Bybee -- became a member of the Snake River Sugar
Company ("SRSC" or "Cooperative") by purchasing one share of its
Common Stock and multiple shares of its Patron Preferred Stock.  Each
plaintiff's entry into the SRSC was memorialized by means of a
contract that is entitled "Subscription Agreement."  Paragraph 13(b)
of each Subscription Agreement states, "The Undersigned may sell its
shares of Patron Preferred Stock to one or more existing members of
the Cooperative . . ., in each case subject to approval by the Board
of Directors." (Subscription Agreement, ¶ 13(b), at 6.)  After

TENTATIVE CONCLUSIONS - 1

purchasing stock in the Cooperative, each plaintiff entered into a Grower Agreement.  Paragraph 1 states in part:

> The Grower owns and has the growing rights to shares of Patron Preferred Stock of the Cooperative (here-in [sic] called "Quota") as reflected on the records of the Cooperative.  Grower recognizes such Quota as the right and obligation to grow, or cause to be grown, one (1) acre of sugarbeets per share for delivery to the Cooperative each crop year.

(Grower Agreement, ¶ 1, at 1.)

In the States of Idaho and Washington, every contract contains an implied contract of good faith and fair dealing.  *See, e.g., Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 288, 824 P.2d 841, 849 (1991); *Badgett v. Security State Bank*, 116 Wn.2d 563, 807 P.2d 356 (1991).  The Supreme Court of the State of Idaho has observed that Idaho's "analysis and definition of the implied covenant of good faith and fair dealing is consistent with surrounding states." *Idaho First Nat'l Bank*, 121 Idaho at 288.  Indeed, in *Idaho First Nat'l Bank*, the Idaho Supreme Court quoted the following passage from *Badgett* with approval:

> There is in every contract an implied duty of good faith and fair dealing.  This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance.  . . .  *However, the duty of good faith does not extend to obligate a party to accept a material change in the terms of its contract.*  . . .  Nor does it "inject substantive terms into the parties' contract."  Rather, it requires only that the parties perform in good faith the obligations imposed by their agreement.  . . .  *Thus, the duty arises only in connection with terms agreed to by the parties.*

121 Idaho at 288 (quoting *Badgett*, 116 Wn.2d at 569) (citations

TENTATIVE CONCLUSIONS - 2

omitted by, and emphasis added by, the Idaho Supreme Court).[1]

The plaintiffs allege that the SRSC breached duties of good faith
and fair dealing that are implied in the Grower and Subscription
Agreements.  Insofar as the Grower Agreements are concerned, the
plaintiffs allege that, during 2004 and 2005, the SRSC improperly
prohibited them from growing one acre of sugarbeets for each acre of
Patron Preferred Stock that they held.  The plaintiffs further allege
that agents of the SRSC pressured them to sell their shares of Patron
Preferred Stock, made a disingenuous offer to purchase their shares,
refused to purchase their shares, falsely assured them that they would
not be penalized if they refrained from growing sugarbeets during
2005, and improperly invoked penalty provisions in the Grower
Agreements.  Insofar as the Subscription Agreements are concerned, the
plaintiffs allege that the SRSC frustrated their efforts to sell their
shares of Patron Preferred Stock to other members of the SRSC.  The
defendants move for summary judgment.

**IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING**

Grower Agreements

*1. Acreage reductions*

By the end of 2003, the SRSC was producing more sugarbeets than
its sister company, The Amalgamated Sugar Company ("TASCO"), could
process and sell profitably.  During both 2004 and 2005, the SRSC's
Board of Directors decided to limit the Cooperative's production of
sugarbeets by restricting the number of acres that its members could

[1]Since there is no conflict between the law of the States of
Idaho and Washington, choice of law analysis is unnecessary.
Local law applies.  *Erwin v. Cotter Health Centers*, 161 Wn.2d
676, 692, 167 P.3d 1112 (2007).

TENTATIVE CONCLUSIONS - 3

plant.  Even assuming, for purposes of argument, that the SRSC violated the Grower Agreements' one-acre-per-share provision, a rational jury would be unable to find that the Cooperative acted in bad faith.  First, there is no evidence that the SRSC fabricated the existence of a sugar surplus or its potentially damaging effect upon the Cooperative.  To the contrary, it is undisputed that the SRSC had a surplus of refined sugar by the end of 2003 and that the surplus created serious financial problems for the Cooperative.  Second, there is no evidence that the SRSC acted deviously in responding to the problem.  To the contrary, the SRSC's decision to limit production was made through its normal decision-making process; a process in which the plaintiffs had a small voice.  Third, there is no evidence that the SRSC's response was economically unreasonable.  To the contrary, during 2004 and the first eight months of 2005, it appeared that the Cooperative had little hope of increasing sales.  Consequently, its only apparent option was to limit production of sugarbeets.  Finally, there is no evidence that the Cooperative imposed the disputed acreage reductions as a result of ill will toward the plaintiffs.  For example, the SRSC's motives would be suspect if the limits applied only to the plaintiffs; but that was not the case, the limits applied to all of the SRSC's growers.

   *2. Pressure to sell stock*

   The plaintiffs allege that, on January 5, 2005, Ralph Burton told them that the SRSC intended to make it prohibitively expensive for them to continue growing sugarbeets within three years by requiring them to pay for services that the Cooperative was then providing at no charge.  The plaintiffs allege that Mr. Burton made this statement in order to pressure them into selling their shares of Patron Preferred

TENTATIVE CONCLUSIONS - 4

Stock to the SRSC, *i.e.*, terminating their contractual relationship
with the Cooperative.  Put somewhat differently, the plaintiffs allege
that they were subjected to duress.

Depending upon what Mr. Burton actually said, his statement about
the SRSC's future intentions could have constituted an attempt to
obtain release from contractual duties by means of a threat.  *Cf.* 2
Joseph M. Perillo & Helen Hadjiyannakis Bender, *Corbin on Contracts* §
7.21, at 461-69 (rev. ed. 1995) (discussing bad-faith demands for
contract modifications).  However, "[a] threat, even if improper, does
not amount to duress if the victim has a reasonable alternative to
succumbing and fails to take advantage of it."  *Restatement (Second)
of Contracts* § 176 cmt. b (1981).  The plaintiffs had a reasonable
alternative.  Like their fellow Washington growers, they could have
planted sugarbeets during 2005.  Thus, even if Mr. Burton made the
statement attributed to him, and even if the statement constituted a
threat, the plaintiffs cannot prove duress.  *Cf. Retail Clerks Health
& Welfare Trust Funds v. Shopland Supermarket, Inc.*, 96 Wn.2d 939,
943-44, 640 P.2d 1051 (1982) ("circumstances must demonstrate a person
was deprived of his free will at the time he entered into the
challenged agreement in order to sustain a claim of duress"); *Nord v.
Eastside Assn. Ltd.*, 34 Wn. App. 796, 798-99, 664 P.2d 4 (1983)
(person alleging business compulsion must prove that offending party
caused or contributed to his vulnerability and exerted the pressure
that brought about the decision to enter into the agreement).

*3. Response to offer*

The plaintiffs allege that, on January 5th, Mr. Burton promised
them that the SRSC would purchase their shares of Patron Preferred
Stock at a reasonable price if they ceased growing sugarbeets.  The

TENTATIVE CONCLUSIONS - 5

plaintiffs concede that Mr. Burton lacked actual authority to make the promise.[2]  Not knowing this, say the plaintiffs, they submitted a memorandum to the executive committee setting forth the terms upon which they were willing to sell.  The executive committee rejected their terms, but did not inform them of its decision.  According to the plaintiffs, the executive committee acted in bad faith by refusing to purchase their shares; and then compounded its bad faith by failing to inform them of its decision.

     Neither of the plaintiffs' allegations is sufficient to withstand summary judgment.  To begin with, an implied duty of good faith "'arises only in connection with terms agreed to by the parties.'" *Idaho First Nat'l Bank,* 121 Idaho at 288 (quoting *Badgett*, 116 Wn.2d at 569).  As the defendants point out, neither the Subscription Agreements nor the Grower Agreements contain provisions obligating the SRSC to negotiate the purchase of the plaintiffs' shares of Patron Preferred Stock.  *Cf. Keystone Land & Dev. Co. v. Xerox Corp.*, 152 Wn.2d 171, 179, 94 P.3d 945 (2004) (no contract to negotiate a future contract where the "parties did not exchange promises to conform to a specific course of conduct during negotiations, such as negotiating in good faith, exclusively with each other, or for a specific period of time").  Absent specific provisions regarding the purchase of shares, a duty to negotiate in good faith cannot be implied.  *See id.* at 177 ("there is no 'free-floating' duty of good faith and fair dealing that is unattached to an existing contract" (quoting *Badgett*, 116 Wn.2d at 570)).  Since the SRSC was under no obligation to negotiate a purchase

----

     [2]Apparent authority is a different matter.  The plaintiffs make no concession in that regard.

TENTATIVE CONCLUSIONS - 6

of the plaintiffs' shares, it was under no obligation to inform them of its rejection of their counteroffers. *Cf. Saluteen-Maschersky v. Countrywide Funding Corp.*, 105 Wn. App. 846, 853, 22 P.3d 804 (2001) ("Failure to reject an offer is not equivalent to assent of that contract since silence is acceptance only where there is a duty to speak.").

*4. False assurances*

During the Winter or Spring of 2005, Brandon Munn questioned Vic Jaro, SRSC's Vice President of Agriculture, about the contractual ramifications of his family's decision not to plant sugar beets during 2005. The following is Brandon's recollection of one part of the conversation:

> In the end, . . . I asked him, if we don't grow these sugarbeets, which we're not planning on doing, will it look negatively on us if this buyout doesn't happen until later, and he says nope, it won't look negatively, we know the buyout's in progress, just because it's not finalized today doesn't mean you'll be penalized later.

The Court has tentatively concluded that genuine issues of material fact exist with respect to whether Mr. Jaro assured Brandon that Duane Munn & Sons Farms LLC would not be penalized if the Munn family refrained from planting sugarbeets during 2005, and, assuming that Mr. Jaro gave such an assurance, whether the Munn family justifiably relied upon it.

The Court's tentative conclusion with respect to the plaintiffs' promissory-estoppel claim is not the end of the matter. The plaintiffs also allege that Mr. Jaro and other agents of the SRSC acted in bad faith during the Spring of 2005. According to the plaintiffs, Messrs. Jaro and Mr. Burton must have realized that the

SRSC would gain a significant negotiating advantage if they refrained from planting sugarbeets. Without a commitment on the part of the executive committee to purchase their shares, observe the plaintiffs, their decision to refrain from planting exposed them to the penalties set forth in the Grower Agreements. The plaintiffs argue that the existence of those penalties has given the SRSC enormous leverage. In their opinion, not only did Messrs. Burton and Jaro anticipate this contingency, but also they sought to bring it about by making statements which falsely suggested that the SRSC was interested in purchasing their shares.

The evidence bearing upon the preceding allegations is mixed. As the Court explained in its order granting Mr. Burton's motion for summary judgment, his comments to the plaintiffs after the January 5th meeting were fairly cautious. After that point in time, he neither asked them to refrain from planting sugarbeets, nor did he encourage them to think that a purchase agreement was imminent. By contrast, Mr. Jaro allegedly spoke with Brandon Munn about his family's decision not to plant sugarbeets during 2005. If one accepts Brandon's recollection of the conversation, Mr. Jaro said that the Munn family's decision "won't look negatively[.] [W]e know the buyout's in progress[;] just because it's not finalized today doesn't mean you'll be penalized later." At the time Mr. Jaro allegedly made those statements, he knew that Duane Munn & Sons Farms LLC was contractually obligated to deliver its quota of sugarbeets to TASCO at the conclusion of the 2005 growing season. Consequently, Mr. Jaro was subject to an implied duty, *viz.*, to candidly answer Brandon's questions regarding his family's performance of its contractual obligations. A rational jury arguably could find that at the time Mr.

TENTATIVE CONCLUSIONS - 8

Jaro allegedly made the statements attributed to him by Brandon, he knew that the executive committee had rejected the plaintiffs' counteroffers and that the SRSC probably would not purchase their shares of Patron Preferred Stock.  Were a jury to determine that Mr. Jaro possessed such knowledge when he spoke to Brandon, the jury could find that Mr. Jaro acted in bad faith by creating a false impression that Duane Munn & Sons Farms LLC was going to be relieved of its contractual obligations.

   *5. Invoking penalty provisions*

   Pursuant to paragraphs 7 and 8 of each Grower Agreement, the SRSC may impose penalties in the event a member fails to deliver his quota of sugarbeets.  The fact that the Grower Agreement confers discretion upon the SRSC means that the SRSC has an implied duty to exercise its authority in good faith.  *Cf. Goodyear Tire & Rubber Co. v. Whiteman Tire*, 86 Wn. App. 732, 738, 935 P.2d 628 (1997) (hereinafter "*Goodyear*") ("The covenant of good faith applies when the contract gives one party discretionary authority to determine a contract term[.]").  During the Winter and Spring of 2005, employees of the SRSC who worked with the plaintiffs observed that they were neither planting nor preparing to plant sugarbeets.  The employees who noticed the plaintiffs' lack of activity allegedly communicated this information to their superiors.  Since the SRSC depends upon its members' annual deliveries of sugarbeets, the plaintiffs' failure to plant or prepare to plant jeopardized the SRSC's economic expectations under the Grower Agreements.  Nevertheless, despite the contractual and financial implications of the plaintiffs' inactivity, no one asked them why they weren't planting.  No one informed them that their counteroffers had been rejected, and no one reminded them that their

TENTATIVE CONCLUSIONS - 9

failure to plant violated their respective Grower Agreements. Instead, the SRSC's officers and employees either remained silent or, in at least one instance, allegedly made misleading statements.  Given the SRSC's and the plaintiffs' common interest in maintaining the financial well-being of the Cooperative, a rational jury could find that the SRSC violated its duty of good faith by remaining silent during 2005 until it was too late for the plaintiffs to plant and then penalizing them for failing to do so.  *Cf. Restatement (Second) of Contracts* § 205 cmt. a (1981) ("[g]ood faith . . . enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party"").[3]

<u>Subscription Agreements</u>

Paragraph 13(b) of each Subscription Agreement states, "The Undersigned may sell its shares of Patron Preferred Stock to one or more existing members of the Cooperative . . ., in each case subject to approval by the Board of Directors."  This provision confers discretion upon the Board, *e.g.*, to grant or deny a grower's request to sell his shares.  As a result, the Board is bound by an implied covenant of good faith and fair dealing.  *See Goodyear*, 86 Wn. App. at 738.  In order to fulfill its implied obligations, the Board must exercise its authority in a manner that is consistent "with the justified expectations" of the SRSC's growers.  *Restatement, supra,* § 205 cmt. a.  Washington appellate courts apply the covenant of good faith and fair dealing in a balanced manner.  As one court explained, while the covenant "casts on each party a duty not to interfere with

[3]The Washington Court of Appeals has quoted part of this definition with approval.  *Frank Coluccio Constr. Co. v. King County*, 136 Wn. App. 751, 766, 150 P.3d 1147 (2007).

TENTATIVE CONCLUSIONS - 10

the other party's performance[,] . . . [i]t does not . . . cast on either party a duty to affirmatively assist in the other party's performance." *State of Washington v. Trask*, 91 Wn. App. 253, 272-73, 957 P.2d 781, 974 P.2d 1269 (1998).  Applying those principles to the facts of this case, it is clear that the Board did not have a duty to locate SRSC growers who were willing to purchase the plaintiffs' shares.  Nevertheless, the Board's freedom of action was subject to significant constraints.  It could neither unreasonably interfere with the plaintiffs' efforts to find suitable buyers, nor could it unreasonably withhold approval of a proposed sale.

The parties disagree with respect to whether the Board acted unreasonably.  The plaintiffs allege that the Board denied them access to a list of SRSC growers in eastern Idaho, actively discouraged SRSC growers in eastern Idaho from purchasing their shares, and imposed conditions that made it impossible for them to arrange sales.  The defendants dispute each of the plaintiffs' contentions.  Furthermore, the defendants allege that they had compelling business reasons for prohibiting the plaintiffs from selling shares to SRSC growers in eastern Idaho.  As the plaintiffs note, sugarbeets must be processed. Processing plants have been built in locations that will best serve the largest number of SRSC growers.  Allowing a grower in eastern Washington to sell his shares -- *i.e.*, his right to produce sugarbeets -- to a grower in eastern Idaho could result in the underutilization of one processing plant and the overutilization of another.  In the defendants' opinion, this could have a disastrous impact upon the Cooperative.

The plaintiffs do not seem to be contesting the defendants' utilization argument.  To the contrary, they seem to concede that

TENTATIVE CONCLUSIONS - 11

transferring sugarbeet production from one geographic area to another could result in an economically inefficient use of the SRSC's processing plants. Even so, they insist that a jury issue exists. According to the plaintiffs, there is evidence that the Board intentionally frustrated their efforts to sell their shares. Apparently, the only SRSC growers who potentially were interested in purchasing the plaintiffs' shares were growers whose farms are located in eastern Idaho. The Board would not give the plaintiffs a list of the names of eastern-Idaho growers. In addition, the Board allegedly told eastern-Idaho growers that it would not allow them to purchase the plaintiffs' shares. Finally, the Board allegedly told the plaintiffs that it would not approve any share sales until after they submitted their "make-whole" payments.[4] Viewing the record in the light most favorable to the plaintiffs, a rational jury could find that the Board never had any intention of allowing the plaintiffs to sell their shares to growers outside the State of Washington. That does not necessarily mean a jury issue exists. The plaintiffs have not identified any evidence rebutting the defendants' assertion that permitting the plaintiffs to sell their shares to eastern-Idaho growers would have disrupted the SRSC's sugarbeet-processing system; which, according to the defendants, would have undermined the financial well-being of the Cooperative. Absent evidence rebutting the defendants' utilization argument, the plaintiffs cannot prove that

---

[4]It is unclear whether the Board told the plaintiffs that it would not consider sales until after they submitted their make-whole payments, or whether the Board told them that they had to submit their make-whole payments when the sales closed, or whether the Board's statements regarding make-whole payments were ambiguous.

TENTATIVE CONCLUSIONS - 12

the Board abused the discretion conferred by paragraph 13(b) of the Subscription Agreements.  After all, the only expectations that the Board was obligated to respect were justifiable ones.  The plaintiffs could not have justifiably expected the Board to approve a sale of shares that would damage the SRSC.  Thus, unless a rational jury could find that the plaintiffs' attempt to sell their shares to eastern-Idaho growers would not have harmed the SRSC, the plaintiffs cannot prove that the Board abused its discretion by blocking such sales.  As the record now stands, a rational jury could not find for the plaintiffs on this point.[5]

**TENTATIVE CONCLUSIONS**

1. That the defendants are entitled to summary judgment with respect to the plaintiffs' allegations that the SRSC or its agents acted in bad faith by unilaterally imposing acreage reductions, pressuring the plaintiffs to sell their shares of Patron Preferred Stock, failing to respond to their counteroffers, and frustrating their efforts to sell their shares to growers in eastern Idaho.

2. That genuine issues of material fact exist with respect to the plaintiffs' allegations that the SRSC or its agents acted in bad faith by providing misleading assurances to Brandon Munn and by invoking the

---

[5]One other issue remains.  During 2006, the parties discussed resolution of their dispute.  They may have exchanged offers of settlement.  At some point, the SRSC told the plaintiffs that it would not pay them anything if they kept trying to sell their shares to eastern-Idaho growers.  The plaintiffs allege that the SRSC's demand violated an obligation to negotiate in good faith.  They are incorrect.  As explained above, neither the Subscription Agreements nor the Grower Agreements create a duty to negotiate.  *See supra* pp. 6-7.

TENTATIVE CONCLUSIONS - 13

penalties set forth in the Grower Agreements with respect to the 2005 crop year.

**CONCLUSIONS ARE TENTATIVE**

The preceding conclusions are tentative. After listening to oral argument, the Court may modify or abandon some or all of them. Since this is not an order, the Court will not consider a motion for reconsideration. Nor will the Court consider supplemental evidence or memoranda. The record is complete for purposes of dispositive motions.

**THE DISTRICT COURT EXECUTIVE** is hereby directed to enter the Court's tentative conclusions and furnish copies to counsel.

**DATED** this ___8th___ day of August, 2008.

_____s/ Fred Van Sickle_____
Fred Van Sickle
Senior United States District Judge

TENTATIVE CONCLUSIONS - 14