UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

BYBEE FARMS LLC, et al.,

             Plaintiffs,

       v.

SNAKE RIVER SUGAR COMPANY, et al.,

           Defendants.

No. CV-06-5007-FVS

ORDER GRANTING AND DENYING MOTIONS

**THIS MATTER** came before the Court based upon the parties' cross motions for summary judgment.

**BACKGROUND**

The Snake River Sugar Company ("SRSC" or "the Cooperative") is organized under the law of the State of Oregon.  Each year, the SRSC purchases sugarbeets from its member growers and sells them to The Amalgamated Sugar Company ("TASCO"), a sister company.  The latter processes the beets and sells the refined sugar.  A sugarbeet grower becomes a member of the SRSC by signing a Subscription Agreement, which is a contract to purchase one share of common stock and multiple shares of patron preferred stock.  Under Article IV of the Second Amended and Restated Articles of Incorporation (hereinafter "Articles"), ownership of patron preferred stock confers both a right and a responsibility to produce sugarbeets:

        Section 3. <u>Patron Preferred Stock</u>.

ORDER - 1

. . . .

Paragraph 2. *Rights*.

. . . .

(b) Delivery Rights or Quota. The holders of Patron Preferred Stock shall be entitled and obligated to deliver the sugarbeets from one (1) acre of land per share of Patron Preferred Stock held in accordance with the rules and regulations established by the Board of Directors governing delivery rights and quota as exists from time to time.

(Article IV, § 3, ¶ 2(b), p. 3.)  An SRSC member also executes a Grower Agreement.  Like the Articles, it confers both a right and a responsibility to grow and deliver sugarbeets:

1. <u>Delivery of Sugarbeets</u>.  The Grower owns and has the growing rights to shares of Patron Preferred Stock of the Cooperative (here-in [sic] called "Quota") as reflected on the records of the Cooperative.  Grower recognizes such Quota as the right and obligation to grow, or cause to be grown, one (1) acre of sugarbeets per share for delivery to the Cooperative each crop year.

(Grower Agreement at 1.)  The Grower Agreement establishes penalties in the event a SRSC member does not fulfill his contractual obligations.  Should he fail to deliver his quota of sugarbeets, he must compensate the SRSC:

7. <u>Failure to Plant, Replant or Deliver Sugarbeets</u>.  In the event Grower does not meet any of the obligations specified in paragraph 5, and such failure is not excused as provided by Paragraph 6, Grower agrees to pay to the Cooperative a cash sum based upon the LLC's most current projection of the resulting decrease in the LLC's distributable cash as defined in the LLC's Company Agreement, computed on a per acre basis ("Distributable Cash Per Acre Decrease").  **In the event Grower has failed to plant or deliver all or any portion of the Grower's full Quota, the Grower will pay to the Cooperative 100% of the Distributable Cash Per Acre Decrease for each acre which was**

ORDER - 2

**not planted or delivered.** . . . Grower recognizes that the Cooperative and its members will suffer damages from lost production, that such amount is difficult to ascertain with certainty, and that the above formula is a fair and reasonable method to determine damages.

*Id.* at 2 (emphasis added).  The parties typically refer to the above-described penalty as a "make-whole payment."  Should a delinquent grower fail to submit his make-whole payment, he forfeits his shares of patron preferred stock:

8.  <u>Agreement to Pay Distributable Cash Per Acre Decrease or the Reversion of Shares</u>.  . . .  **In the event Grower does not pay the Distributable Cash Per Acre Decrease . . . , Grower agrees that Grower's Patron Preferred Stock in an amount equivalent to the number of acres to which said payment failure applies shall immediately revert and transfer to the Cooperative without any further action of Grower**.  The Cooperative agrees to accept the reverted shares as consideration for the discharge of the unpaid Distributable Cash Per Acre Decrease and Grower agrees that such consideration is fair and reasonable.

*Id.* (emphasis added).

In the United States, the production of sugar is regulated by the federal government.  By 2004, the SRSC was producing more sugarbeets than TASCO could process and sell profitably.  Consequently, the SRSC's Board of Directors decided to reduce the number of acres of sugarbeets that each grower could plant.  During 2004, the Board imposed a 5% reduction.  During 2005, the Board imposed a 16% reduction.  Individual growers were not asked to approve the reductions.  As a practical matter, the reductions meant that the SRSC did not allow growers to "deliver the sugarbeets from one (1) acre of land per share of Patron Preferred Stock" during either 2004 or 2005.

ORDER - 3

Instead, during 2004, the Cooperative allowed them to deliver the sugarbeets from approximately .95 acre of land per share of Patron Preferred Stock.  During 2005, the Cooperative allowed them to deliver the sugarbeets from approximately .84 acre of land per share.

The members of the SRSC are located in the States of Idaho, Washington, and Oregon.  The SRSC is divided into districts.  One district is composed of Washington growers, including Bybee Farms LLC, Duane Munn & Sons Farms LLC, Neal Bybee, Brent Schulthies Farms LLC, Brent Hartley Farms LLC, and R. Munn Farms LLC.  The growers listed above have formed a partnership named Sunheaven Farms.  David R. Walker is its manager.  Besides managing the partnership, he also sits on the SRSC's board of directors.

Sugarbeets grown by SRSC members must be transported to TASCO processing plants.  The freight rates for transporting sugarbeets grown in the Washington district are among the highest in the cooperative.  The SRSC was willing to accept this circumstance as long as TASCO could profitably process the growers' sugarbeets and sell the refined sugar.  By 2004, that was no longer the case.  Not only was TASCO prohibited by federal regulation from selling all of the sugar that it refined (which created an enormous surplus), but the price of sugar dropped precipitously.

Ralph Burton was the president of the SRSC and the president and CEO of TASCO at all times relevant to this action.  During the Fall of 2004, he asked to speak to the partners of Sunheaven Farms.  Mr. Walker arranged a meeting, which occurred in the State of Washington on January 5, 2005.  Mr. Burton allegedly said that TASCO was refining

ORDER - 4

more sugar than it could sell profitably.  According to Clyde Bybee, one of the persons who was present at the meeting, Mr. Burton said that the SRSC intended to "collapse" the Washington district within three years in order to save money.  Mr. Bybee recalls Mr. Burton saying that the SRSC might make the Sunheaven Farms partners pay for services that the cooperative was now providing at no cost.  Mr. Bybee thought he understood what Mr. Burton meant.  In the next few years, the SRSC was going to make it prohibitively expensive for them to grow sugarbeets.  There was an alternative, said Mr. Burton.  He allegedly asked the partners to cease growing sugarbeets and sell their shares of stock to the SRSC, going on to indicate that their shares of patron preferred stock were worth $800.00 per share.

The Sunheaven Farms partners knew that Mr. Burton had significant influence with the directors.  He was, in the words of Mr. Walker, "someone that could get things done."  The partners assumed that his request had the tacit, if not the express, approval of the executive committee of the SRSC's board of directors.  Thus, on January 17th, they submitted a memorandum to the executive committee.  Two partners said they intended to grow sugarbeets during 2005, but would be willing to sell their shares after three years if the Washington district was going to be "collapsed."  Three other partners said they were presently willing to sell their shares for $1000.00 per share, but would grow sugarbeets during 2005 if the executive committee rejected their offers.

On January 24th, Mr. Burton sent a three-paragraph email to Mr. Walker in which he alluded to the growers' respective offers.  The

ORDER - 5

last paragraph of Mr. Burton's email states, "I don't have anything definitive and may not for a while.  This of course argues that this may be a next year deal."  Mr. Walker printed the email and jotted a note on it before providing copies to the partners of Sunheaven Farms. "Thought you might be interested in Ralph's comments," he advised the partners.  "Getting $1,000 per share will not be slam dunk."

On February 17th, the executive committee held a meeting by means of a telephone conference call.  Participants discussed the offers made by the Sunheaven Farms partners and decided they were unacceptable.  Although Mr. Burton participated in the call, and although he was aware of the executive committee's decision, he did not inform the Sunheaven Farms partners that their offers had been rejected.

Duane Munn & Sons Farms was one of the growers who submitted an offer to sell.  Brandon Munn is one of Duane's sons.  Brandon is actively involved in the operation of Duane Munn & Sons Farms.  While he knew that his father had made a decision not to plant sugarbeets in 2005, and while he believed that "a deal was in progress," the absence of a response from the executive committee made him anxious.  His anxiety was justified.  As explained above, paragraphs 7 and 8 of the Grower Agreement establish penalties in the event a member fails to fulfill his contractual obligations.  Brandon may not have know the precise terms of Paragraphs 7 and 8, but he knew that his father's decision not to plant sugarbeets could result in severe penalties. Consequently, he repeatedly questioned Vic Jaro, SRSC's Vice President of Agriculture, about the contractual ramifications of his father's

decision not to plant sugar beets during 2005:

> In the end, . . . I asked him, if we don't grow these
> sugarbeets, which we're not planning on doing, will it look
> negatively on us if this buyout doesn't happen until later,
> and he says nope, it won't look negatively, we know the
> buyout's in progress, just because it's not finalized today
> doesn't mean you'll be penalized later.

Mr. Jaro's comments allayed Brandon's concerns. Nevertheless, by the Summer of 2005, it had become apparent to all concerned that a buyout was not in progress. During the Fall, Duane Munn & Sons Farms LLC and Bybee Farms LLC retained counsel, who began negotiating with the SRSC. Fearing that the SRSC intended to invoke the penalty provisions contained in the Grower Agreement, those two growers and a third company filed the instant action on January 26, 2006. Negotiations continued thereafter, but the parties were unable to resolve their differences. Relying upon paragraph 7 of the Grower Agreement, the Board demanded payment of $75.00 for each acre of land that the plaintiffs failed to plant. When they did not submit the make-whole payments demanded by the Board, it forfeited their shares of Patron Preferred Stock pursuant to paragraph 8. On June 4, 2007, the plaintiffs filed a second amended complaint. The defendants have filed an answer that denies liability and asserts counterclaims. The parties have filed cross-motions for summary judgment.

**OFFER/COUNTEROFFER**

The plaintiffs allege that Mr. Burton made essentially the following offer on January 5, 2005. "If you will cease growing sugarbeets, the SRSC will purchase your shares of patron preferred stock at a reasonable price." That is to say, Mr. Burton allegedly

ORDER - 7

offered the plaintiffs a promise (the SRSC will purchase your shares of stock) in exchange for a forbearance on the plaintiffs' part (if you will cease growing sugarbeets).  By allegedly making this offer, Mr. Burton laid the foundation for unilateral contracts between the SRSC and the plaintiffs.  *Browning v. Johnson*, 70 Wn.2d 145, 148, 422 P.2d 314 (1967) ("A unilateral contract is one in which a promise is given in exchange for an act or forbearance.").  *See also* 25 David K. DeWolf et al., *Washington Practice, Contract Law and Practice* § 1:4, at 7-9 (2007).

Mr. Burton may have laid the foundation for unilateral contracts, but enforceable contracts did not arise on January 5th.  Indeed, contracts could not arise until the plaintiffs refrained from planting sugarbeets.  Only by providing the forbearance requested by Mr. Burton could the plaintiffs accept his alleged offer to purchase their shares of patron preferred stock.  *See Multicare Med. Center v. State, Dep't of Soc. & Servs.*, 114 Wn.2d 572, 584, 790 P.2d 124 (1990) ("under a unilateral contract, an offer cannot be accepted by promising to perform; rather, the offeree must accept, if at all, by performance, and the contract then becomes executed" (citing *Cook v. Johnson*, 37 Wn.2d 19, 23, 221 P.2d 525 (1950))).  Furthermore, the putative parties to the contracts had not agreed upon the value of the plaintiffs' respective shares.  *Cf. Kloss v. Honeywell*, 77 Wn. App. 294, 298, 890 P.2d 480 (1995) (as a general rule, "price" is one of the essential elements of a contract).  Mr. Burton allegedly told the plaintiffs that he thought their patron preferred stock was worth $800.00 per share.  They thought their stock was worth more than that.

ORDER - 8

In order to obtain a better price, they demanded $1000.00 per share and threatened to plant sugarbeets unless the SRSC assented.

The plaintiffs never intended to carry out the threat.  To the contrary, it was a "bargaining chip."  They had decided to accept Mr. Burton's alleged offer and to sell their shares of patron preferred stock to the SRSC.  Nevertheless, by conditioning a sale upon the SRSC's assent to the price that they named, they effectively rejected Mr. Burton's alleged offer.  *See Rorvig v. Douglas*, 123 Wn.2d 854, 858, 873 P.2d 492 (1994) ("an acceptance that requests modification of terms may consummate a contract unless the additional terms are conditions of acceptance" (citing *Restatement (Second) of Contracts* § 61 (1981))).  At most, the plaintiffs made counteroffers.  *See Blue Mountain Constr. Co. v. Grant County Sch. Dist. No. 150-204*, 49 Wn.2d 685, 688, 306 P.2d 209 (1957) ("An expression of assent that changes the terms of the offer in any material respect may be operative as a counteroffer; but it is not an acceptance and consummates no contract.").

The executive committee did not respond to the plaintiffs' memorandum of January 17th.  Assuming, for purposes of argument, that the plaintiffs' memorandum set forth counteroffers, the executive committee's silence did not amount to acceptance unless the executive committee had a duty to inform the plaintiffs of its decision.  *See Saluteen-Maschersky v. Countrywide Funding Corp.*, 105 Wn. App. 846, 853, 22 P.3d 804 (2001).  "Acceptance by silence is exceptional."  *Restatement (Second) of Contracts* § 69, cmt. a (1981).  Typically, a duty to speak arises in two classes of cases:  "those where the

offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance." *Id.*, cmt. b.  This case does not fall into either class.  The SRSC did not accept services from the plaintiffs. *Cf. Hoglund v. Meeks*, 139 Wn. App. 854, 872, 170 P.3d 37 (2007) (an attorney's silence constituted acceptance of a fee-splitting agreement where she continued to accept the other attorney's legal services and "repeatedly promised to work out the specific terms of a written memorialization of their agreement").  Nor did the plaintiffs ever say to the SRSC that they would construe its silence as acceptance.  As a result, the executive committee's failure to inform the plaintiffs of its decision did not constitute acceptance of their respective counteroffers.

**PROMISSORY ESTOPPEL (First Cause of Action)**

The plaintiffs seek to enforce Mr. Burton's and Mr. Jaro's alleged promises under the doctrine of promissory estoppel.  "The purpose of promissory estoppel is '"'to make a promise binding, under certain circumstances, without consideration in the usual sense of something bargained for and given in exchange.'"'" *Greaves v. Medical Imaging Sys., Inc.*, 124 Wn.2d 389, 398, 879 P.2d 276 (1994) (quoting *Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 261 n.4, 616 P.2d 644 (1980) (quoting *Raedeke v. Gibraltar Savings & Loan Ass'n*, 10 Cal.3d 665, 672-73, 111 Cal.Rptr. 693, 517 P.2d 1157 (1974) (quoting *Youngman v. Nevada Irrigation Dist.*, 70 Cal.2d 240, 249, 74 Cal.Rptr. 398, 449 P.2d 462 (1969)))).  In order to prevail, the plaintiffs must prove the existence of "(1) [a] promise which (2) the

ORDER - 10

promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise." *Corbit v. J.I. Case Co.*, 70 Wn.2d 522, 539, 424 P.2d 290 (1967) (citing Restatement of Contracts § 90 (1932)).

A. Mr. Burton's Alleged Promise

The plaintiffs allege that Mr. Burton promised them that the SRSC would purchase their shares of patron preferred stock at a reasonable price if they ceased growing sugarbeets. The plaintiffs further allege that they ceased growing sugarbeets -- *i.e.*, they changed position -- in reliance upon his alleged promise. The plaintiffs' change of position was a type of forbearance. Black's Law Dictionary (8th ed.2004) (defining forbearance as "refraining from enforcing a right"). Moreover, their forbearance arguably was bargained for. Mr. Burton sought it in exchange for his alleged promise, and the plaintiffs gave it in exchange for his promise. *Restatement, supra,* § 71(2) (a forbearance "is bargained for if it is sought by the promisor [here, Mr. Burton] in exchange for his promise and is given by the promisee [here, the plaintiffs] in exchange for that promise").[1] Not only does it appear that the plaintiffs' forbearance was bargained for, but also it appears that they suffered a detriment as a result. They gave up both the contractual right to grow sugarbeets and the satisfaction and income they had derived from doing so. *See Browning*,

[1]The Washington Supreme Court adopted § 71 in *Labriola v. Pollard Group, Inc.*, 152 Wn.2d 828, 833-34, 100 P.2d 791 (2004).

ORDER - 11

70 Wn.2d at 148 (detriment means "giving up of 'something which immediately prior thereto the promisee was privileged to retain'" (quoting 1 *Williston on Contracts* § 102A, at 382 (3rd ed.1957))). And by ceasing sugarbeet production, the plaintiffs arguably conferred a benefit upon the SRSC. Without question, they gave the SRSC something that Mr. Burton actively sought; something he thought would benefit the SRSC as a whole. He may have been proved incorrect by subsequent events, but during January of 2005, he was convinced that reduced sugarbeet production was essential to the financial health of the SRSC.

It may be that the plaintiffs provided the SRSC with a bargained-for forbearance. In other words, the plaintiffs' forbearance may have constituted consideration for Mr. Burton's alleged promise. *See Vehicle/Vessel, LLC v. Whitman County*, 122 Wn. App. 770, 777, 95 P.3d 394 (2004) ("[c]onsideration for a unilateral contract consists of the offeree's performance of the required terms" (citing *Multicare Med. Center*, 114 Wn.2d at 584)). The existence of a bargained-for forbearance -- if, indeed, the forbearance was bargained for -- could be fatal to the plaintiffs' promissory estoppel claim. "If the promisee's performance [here, the plaintiffs' forbearance] was requested at the time the promisor made his promise [here, Mr. Burton's alleged promise regarding the SRSC's purchase of their stock] and that performance was bargained for, the doctrine [of promissory estoppel] is inapplicable." *Greaves*, 124 Wn.2d at 398 (internal quotation marks and citations omitted). *See also* 3 Eric Mills Holmes, *Corbin on Contracts* § 8.12, at 79-80 (rev. ed.1996) ("the doctrine [of

ORDER - 12

promissory estoppel] is inapplicable as a matter of law when all the promises made are bargained for and supported by consideration"). At oral argument, the plaintiffs insisted that they may bring a claim for promissory estoppel even if their act of refraining from planting sugarbeets was given in exchange for Mr. Burton's promise. According to the plaintiffs, a promisee may bring a claim for promissory estoppel if he cannot establish the elements of a unilateral contract, *i.e.*, the promisee has no remedy under "'the law of consideration.'" *Youngman v. Nevada Irrigation Dist.*, 70 Cal.2d 240, 249, 74 Cal.Rptr. 398, 404, 449 P.2d 462 (1969) (quoting *Healy v. Brewster*, 59 Cal.2d 455, 463, 30 Cal.Rptr. 129, 133, 380 P.2d 817 (1963)).[2] *See also* 3 E. Holmes, *supra* § 8.12, at 80 ("[w]hen a promisee's conduct in reliance is bargained for, the law of consideration is triggered"). The plaintiffs cited no authority for this proposition and, to date, independent research has failed to uncover any. To the contrary, it appears that the plaintiffs remedy for the SRSC's failure to honor Mr. Burton's alleged promise was to bring a claim for breach of a unilateral contract. The plaintiffs decided not to seek relief under the law of consideration. Having made that choice, it does not appear that they may bring a cause of action for promissory estoppel based upon Mr. Burton's alleged promise. Nevertheless, the Court reserves ruling upon this issue because the parties have not had an opportunity to submit memoranda.

---

[2]This line of California cases was cited with approval in *Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 261 n.4, 616 P.2d 644 (1980).

ORDER - 13

B. Mr. Burton's Authority

Mr. Burton was the SRSC's agent at all times relevant to this action.  In Washington, "[a]n agent can bind [his] principal to a contract when the agent has either actual or apparent authority."  *See Hoglund*, 139 Wn. App. at 866.  Mr. Burton did not have actual authority to offer to purchase the plaintiffs' shares of stock if they ceased growing sugarbeets.  Thus, the plaintiffs must prove that he had apparent authority to do so.  "Whether an agent has apparent authority to make a contract depends upon the circumstances and is to be decided by the trier of fact."  *State of Washington v. French*, 88 Wn. App. 586, 595, 945 P.2d 752 (1997) (internal punctuation and citations omitted)).  Summary judgment is warranted where "the evidence presented by both sides would permit the trier of fact to come to only one conclusion."  *Japan Telecom, Inc. v. Japan Telecom Am.*, Inc., 287 F.3d 866, 871 (9th Cir.2002).

"An agent's apparent authority to bind a principal depends upon the objective manifestations of the principal to a third person."  *Id*. A principal may communicate objective manifestations of authority to a third person by word or by deed.  *See Hoglund*, 139 Wn. App. at 869-70. By itself, however, a principal's communication of objective manifestations of authority is not enough to cloak an agent with the principal's authority.  More is required.  Not only must the principal's objective manifestations "cause the one claiming apparent authority to actually, or subjectively, believe that the agent has authority to act for the principal," *Udall v. T.D. Escrow Services, Inc.*, 159 Wn.2d 903, 913, 154 P.3d 882 (2007), but also "the

claimant's actual, subjective belief [must be] objectively reasonable." *Id.* (internal punctuation and citation omitted).

One of the ways in which a principal may cloak an agent with apparent authority is "'by appointing [him] to a position, such as that of manager or treasurer, which carries with it generally recognized duties; to those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position[.]'" *Smith v. Hansen, Hansen & Johnson, Inc.*, 63 Wn. App. 355, 365, 818 P.2d 1127 (1991) (quoting *Restatement (Second) of Agency* § 27 cmt. a (1958)), *review denied*, 118 Wn.2d 1023 (1992). The SRSC employed Mr. Burton as its president. The plaintiffs knew that. They also knew that he had asked to speak to them in his official capacity and that he was someone who "could get things done" (*i.e.*, he wielded considerable influence within the SRSC). In view of these circumstances, a rational jury would have no trouble finding that they subjectively believed Mr. Burton was speaking with the approval of the SRSC when he asked them to cease growing sugarbeets and sell their shares.

The more difficult issue is whether a rational jury could also find that the plaintiffs' subjective perception of Mr. Burton's authority was objectively reasonable. The plaintiffs were receiving advice from David Walker, who was the manager of Sunheaven Farms and a member of the SRSC's board of directors. During his deposition, Mr. Walker acknowledged that he could think of no SRSC officer or employee who was authorized to purchase a grower's shares without board approval. To the contrary, he assumed that board approval would be

required.  Despite his awareness of this limitation on Mr. Burton's authority as president, neither Mr. Walker nor any of the plaintiffs attempted to ascertain whether Mr. Burton was speaking for the board when he allegedly offered to purchase their shares of stock.  The absence of any inquiry is significant.  "If a person has been put on notice of limitations of an agent's authority, the person has a duty to inquire into the limitations, and if he fails to do this, he will be deemed to have actual knowledge of the agent's lack of authority." *Stroud v. Beck*, 49 Wn. App. 279, 285, 742 P.2d 735 (1987).  As the record now stands, a rational jury could conclude that the plaintiffs had a duty to inquire based upon the information that was available to them.  However, a jury would not be compelled to reach that conclusion.  It is possible the plaintiffs will be able to persuade the jury that reasonable growers in their position would have thought that inquiry was unnecessary.  Consequently, a jury issue exists with respect to whether the plaintiffs' subjective beliefs about Mr. Burton's authority were objectively reasonable.

C. Mr. Jaro's Alleged Promise

Mr. Jaro is the SRSC's Vice President of Agriculture.  Brandon Munn recalls speaking with Mr. Jaro more than once during the Winter and Spring of 2005, although Brandon is unsure when the conversations occurred.  During one of the conversations, Mr. Jaro allegedly told Brandon that his family's failure to plant sugarbeets "won't look negatively[.]  [W]e know the buyout's in progress[;] just because it's not finalized today doesn't mean you'll be penalized later."  Since Mr. Jaro did not ask anything of Brandon in exchange for his alleged

promise, nor did Brandon offer anything to Mr. Jaro beyond the
forbearance already provided, Mr. Jaro's alleged promise can sustain a
promissory estoppel claim.

A rational jury arguably could find that Mr. Jaro made the
disputed statements between January 17th (the date of the Munns'
counteroffer) and February 17th (the date of the executive committee's
decision).  During that period of time, the Munns received a
pessimistic email from Mr. Burton via Mr. Walker.  Other than that,
the Munns heard nothing from the SRSC about their offer, with the
possible exception of Mr. Jaro's alleged statements to Brandon.  Mr.
Jaro's alleged statements were significant for at least two reasons.
First, his statements encouraged Brandon to think that a purchase-sale
agreement was in process despite evidence to the contrary.  Second,
his statements indicated that the SRSC would not demand make-whole
payments until later, presumably when the deal closed.  This was an
attractive promise.  Brandon reasonably could have believed that if
his family received at least $800.00 per share at closing, which was
the figure Mr. Burton allegedly mentioned during the January 5th
meeting, then his family would have the money necessary to make the
make-whole payments required by the Grower Agreement.  The problem
with Mr. Jaro's alleged statements to Brandon is that no purchase-sale
agreement was in process.  At best, an agreement was something that
Mr. Burton hoped to arrange between the Washington growers and the
SRSC.  Had Mr. Jaro disclosed this information to Brandon, rather than
allegedly misleading him, it is virtually certain that Brandon would
have relayed Mr. Jaro's comments to his father, and it is likely that

his father would have revised his assessment of Mr. Burton's comments at the January 5th meeting.

In the alternative, a rational jury arguably could find that Mr. Jaro made his alleged statements to Brandon after the executive committee meeting.  The defendants do not deny that Mr. Jaro learned of the executive committee's decision on or shortly after February 17th.  If, knowing the executive committee's decision, Mr. Jaro told Brandon, "we know the buyout's in progress," then Mr. Jaro wilfully deceived Brandon.  The alleged deceit was material to the Munns' decision-making process because there was still time to plant.  Undoubtedly, the Munns would have done so had Mr. Jaro disclosed the true state of affairs that existed after February 17th.

It remains to be seen whether a jury will credit Brandon's account of his conversations with Mr. Jaro.  But a jury could credit his account; and if it does, the SRSC may be estopped from reneging on Mr. Jaro's alleged promise to the effect that the Cooperative would not demand make-whole payments from the Munns with respect to the 2005 crop until a purchase-sale agreement closed.

**UNJUST ENRICHMENT (Second Cause of Action)**

The plaintiffs allege that the SRSC has obtained substantial financial benefits because they refrained from growing sugarbeets at Mr. Burton's request.  For one thing, the SRSC's surplus of sugarbeets has been reduced.  For another, the SRSC has avoided paying freight costs.  Finally, the SRSC has obtained, or will obtain, their shares of patron preferred stock without paying for them.  While the plaintiffs allege that the SRSC obtained these benefits because they

refrained from growing sugarbeets, the plaintiffs do not allege that the Court could find from the facts of this case that the SRSC implicitly contracted to pay for these benefits. *See Chandler v. Washington Toll Bridge Auth.*, 17 Wn.2d 591, 600, 137 P.2d 97 (1943) ("[c]ontracts implied in fact arise from . . . circumstances showing a mutual consent and intention to contract"). Rather, the plaintiffs urge the Court to impose upon the SRSC a legal duty to pay for them. Put somewhat differently, the plaintiffs urge the Court to imply the existence of a contract as a matter of law. *See id.* at 600-01 ("'[a] contract implied in law is an obligation imposed upon a person by the law, not in pursuance of his intention and agreement, either express or implied, but found against his will and design, because the circumstances between the parties are such as to render it just that one should have a right and the other a corresponding liability similar to that which would arise from a contract between them'" (quoting *Byram v. Thurston County*, 141 Wash. 28, 39, 251 P. 103, 252 P. 943 (1926))). According to the plaintiffs, failure to find the existence of a quasi contract will result in the unjust enrichment of the SRSC. *See Lynch v. Deaconess Medical Center*, 113 Wn.2d 162, 165, 776 P.2d 681 (1989) ("[q]uasi contracts are founded on the equitable principle of unjust enrichment which simply states that one should not be 'unjustly enriched at the expense of another'" (quoting *Milone & Tucci, Inc. v. Bona Fide Builders, Inc.*, 49 Wn.2d 363, 367, 301 P.2d 759 (1956))).

The plaintiffs' unjust enrichment claim faces a formidable obstacle. Each of the benefits described above -- *i.e.*, reduced

ORDER - 19

production of sugarbeets, reduced freight costs, and forfeiture of stock -- is addressed by an express contract:  either a Grower Agreement, an Annual Planting Contract, or both.[3]  These express contracts govern the parties' rights and responsibilities with respect to sugarbeet production, allocation of freight costs, and stock forfeiture.  When a party is bound by the provisions of a valid, express contract, he "may not disregard the same and bring an action on an implied contract relating to the same matter, in contravention of the express contract."  *Chandler*, 17 Wn.2d at 604.  Thus, the plaintiffs may not bring an unjust enrichment claim based upon the windfall that the SRSC allegedly has reaped.

**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING (Third Cause of Action)**

Each plaintiff's entry into the SRSC was memorialized by means of a contract that is entitled "Subscription Agreement."  Paragraph 13(b) of each Subscription Agreement states, "The Undersigned may sell its shares of Patron Preferred Stock to one or more existing members of the Cooperative . . ., in each case subject to approval by the Board of Directors." (Subscription Agreement, ¶ 13(b), at 6.)  After purchasing stock in the Cooperative, each plaintiff entered into a Grower Agreement.  Paragraph 1 states in part:

The Grower owns and has the growing rights to shares of

---

[3]Paragraph 1(a) of the Grower Agreement states in part, "The Grower agrees to enter into an Annual Planting Contract with the Cooperative setting forth the acres to be grown and the description of the land on which said sugarbeets will be grown[.]"

ORDER - 20

> Patron Preferred Stock of the Cooperative (here-in [sic] called "Quota") as reflected on the records of the Cooperative.  Grower recognizes such Quota as the right and obligation to grow, or cause to be grown, one (1) acre of sugarbeets per share for delivery to the Cooperative each crop year.

(Grower Agreement, ¶ 1, at 1.)

In the States of Idaho and Washington, every contract contains an implied contract of good faith and fair dealing.  *See, e.g., Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 121 Idaho 266, 288, 824 P.2d 841, 849 (1991); *Badgett v. Security State Bank*, 116 Wn.2d 563, 807 P.2d 356 (1991).  The Supreme Court of the State of Idaho has observed that Idaho's "analysis and definition of the implied covenant of good faith and fair dealing is consistent with surrounding states." *Idaho First Nat'l Bank*, 121 Idaho at 288.  Indeed, in *Idaho First Nat'l Bank*, the Idaho Supreme Court quoted the following passage from *Badgett* with approval:

> There is in every contract an implied duty of good faith and fair dealing.  This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance.  . . .  *However, the duty of good faith does not extend to obligate a party to accept a material change in the terms of its contract.*  . . .  Nor does it "inject substantive terms into the parties' contract."  Rather, it requires only that the parties perform in good faith the obligations imposed by their agreement.  . . .  *Thus, the duty arises only in connection with terms agreed to by the parties.*

121 Idaho at 288 (quoting *Badgett*, 116 Wn.2d at 569) (citations omitted by, and emphasis added by, the Idaho Supreme Court).  Since there is no conflict between the law of the States of Idaho and

ORDER - 21

Washington, choice of law analysis is unnecessary.  Local law applies.
*Erwin v. Cotter Health Centers*, 161 Wn.2d 676, 692, 167 P.3d 1112
(2007).

The plaintiffs allege that the SRSC breached duties of good faith
and fair dealing that are implied in the Grower and Subscription
Agreements.  Insofar as the Grower Agreements are concerned, the
plaintiffs allege that, during 2004 and 2005, the SRSC improperly
prohibited them from growing one acre of sugarbeets for each acre of
Patron Preferred Stock that they held.  The plaintiffs further allege
that agents of the SRSC pressured them to sell their shares of Patron
Preferred Stock, made a disingenuous offer to purchase their shares,
refused to purchase their shares, falsely assured them that they would
not be penalized if they refrained from growing sugarbeets during
2005, and improperly invoked penalty provisions in the Grower
Agreements.  Insofar as the Subscription Agreements are concerned, the
plaintiffs allege that the SRSC frustrated their efforts to sell their
shares of Patron Preferred Stock to other members of the SRSC.

A. Unilateral Acreage Reduction

By the end of 2003, the SRSC was producing more sugarbeets than
TASCO could process and sell profitably.  During both 2004 and 2005,
the SRSC's Board of Directors decided to limit the Cooperative's
production of sugarbeets by restricting the number of acres that its
members could plant.  Even assuming, for purposes of argument, that
the SRSC violated the Grower Agreements' one-acre-per-share provision,
a rational jury would be unable to find that the Cooperative acted in
bad faith.  First, there is no evidence that the SRSC fabricated the

existence of a sugar surplus or its potentially damaging effect upon the Cooperative.  To the contrary, it is undisputed that the SRSC had a surplus of refined sugar by the end of 2003 and that the surplus created serious financial problems for the Cooperative.  Second, there is no evidence that the SRSC acted deviously in responding to the problem.  To the contrary, the SRSC's decision to limit production was made through its normal decision-making process; a process in which the plaintiffs had a small voice.  Third, there is no evidence that the SRSC's response was economically unreasonable.  To the contrary, during 2004 and the first eight months of 2005, it appeared that the Cooperative had little hope of increasing sales.  Consequently, its only apparent option was to limit production of sugarbeets.  Finally, there is no evidence that the Cooperative imposed the disputed acreage reductions as a result of ill will toward the plaintiffs.

B. Pressure to Sell Stock

The plaintiffs allege that, on January 5, 2005, Ralph Burton told them that the SRSC intended to make it prohibitively expensive for them to continue growing sugarbeets within three years by requiring them to pay for services that the Cooperative was then providing at no charge.  The plaintiffs allege that Mr. Burton made this statement in order to pressure them into selling their shares of Patron Preferred Stock to the SRSC, *i.e.*, terminating their contractual relationship with the Cooperative.  Depending upon what Mr. Burton actually said, his statement about the SRSC's future intentions could have constituted an attempt to obtain release from contractual duties by means of a threat.  *Cf.* 2 Joseph M. Perillo & Helen Hadjiyannakis

ORDER - 23

Bender, *Corbin on Contracts* § 7.21, at 461-69 (rev. ed. 1995)
(discussing bad-faith demands for contract modifications).  However,
that does not mean Mr. Burton's alleged threat was improper.  "A
threat by a party to a contract not to perform his contractual duty is
not, of itself, improper.  Indeed, a modification induced by such a
threat may be binding, even in the absence of consideration, if it is
fair and equitable in view of unanticipated circumstances."
*Restatement, supra*, § 176 cmt. e.  The defendants argue that Mr.
Burton's comments at the January 5th meeting were justified in view of
the financial crisis which the SRSC was facing at the beginning of
2005.  While the defendants may be correct, reasonable minds can
differ.  The plaintiffs are entitled to present evidence indicating
that Mr. Burton's comments constituted an improper threat.

C. Failure to Respond to Counteroffer

     The plaintiffs allege that, on January 5th, Mr. Burton promised
them that the SRSC would purchase their shares of Patron Preferred
Stock at a reasonable price if they ceased growing sugarbeets.  The
plaintiffs concede that Mr. Burton lacked actual authority to make the
promise.  Not knowing this, say the plaintiffs, they submitted a
memorandum to the executive committee setting forth the terms upon
which they were willing to sell.  The executive committee rejected
their terms, but did not inform them of its decision.  According to
the plaintiffs, the executive committee acted in bad faith by refusing
to purchase their shares; and then compounded its bad faith by failing
to inform them of its decision.

     By itself, neither of the plaintiffs' allegations is sufficient

to create a jury issue.  To begin with, an implied duty of good faith
"'arises only in connection with terms agreed to by the parties.'"
*Idaho First Nat'l Bank,* 121 Idaho at 288 (quoting *Badgett*, 116 Wn.2d
at 569).  As the defendants point out, neither the Subscription
Agreements nor the Grower Agreements contain provisions obligating the
SRSC to negotiate the purchase of the plaintiffs' shares of Patron
Preferred Stock.  *Cf. Keystone Land & Dev. Co. v. Xerox Corp.*, 152
Wn.2d 171, 179, 94 P.3d 945 (2004) (no contract to negotiate a future
contract where the "parties did not exchange promises to conform to a
specific course of conduct during negotiations, such as negotiating in
good faith, exclusively with each other, or for a specific period of
time").  Absent specific provisions regarding the purchase of shares,
a duty to negotiate in good faith cannot be implied.  *See id.* at 177
("there is no 'free-floating' duty of good faith and fair dealing that
is unattached to an existing contract" (quoting *Badgett*, 116 Wn.2d at
570)).  Since the SRSC was under no obligation to negotiate a purchase
of the plaintiffs' shares, it was under no obligation to inform them
of its rejection of their counteroffers.  *Cf. Saluteen-Maschersky*, 105
Wn. App. at 853 ("Failure to reject an offer is not equivalent to
assent of that contract since silence is acceptance only where there
is a duty to speak.").

    D. Invoking Penalty Provisions with Respect to Failure to Plant
During 2005

       Pursuant to paragraphs 7 and 8 of each Grower Agreement, the SRSC
may impose penalties in the event a member fails to deliver his quota
of sugarbeets.  The fact that the Grower Agreement confers discretion

ORDER - 25

upon the SRSC means that the SRSC has an implied duty to exercise its authority in good faith.  *Cf. Goodyear Tire & Rubber Co. v. Whiteman Tire*, 86 Wn. App. 732, 738, 935 P.2d 628 (1997) (hereinafter "*Goodyear*") ("The covenant of good faith applies when the contract gives one party discretionary authority to determine a contract term[.]").  During the Winter and Spring of 2005, employees of the SRSC who worked with the plaintiffs observed that they were neither planting nor preparing to plant sugarbeets.  The employees who noticed the plaintiffs' lack of activity allegedly communicated this information to their superiors.  Since the SRSC depends upon its members' annual deliveries of sugarbeets, the plaintiffs' failure to plant or prepare to plant jeopardized the SRSC's economic expectations under the Grower Agreements.  Nevertheless, despite the contractual and financial implications of the plaintiffs' inactivity, no one asked them why they weren't planting.  No one informed them that their counteroffers had been rejected, and no one reminded them that their failure to plant violated their respective Grower Agreements.  Instead, the SRSC's officers and employees either remained silent or, in at least one instance, allegedly made misleading statements.  Given the SRSC's and the plaintiffs' common interest in maintaining the financial well-being of the Cooperative, a rational jury could find that the SRSC violated its duty of good faith by remaining silent during 2005 until it was too late for the plaintiffs to plant and then penalizing them for failing to do so.  *Restatement, supra*, § 205 cmt. a ("[g]ood faith . . . enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the

ORDER - 26

justified expectations of the other party""").[4]

E. Subscription Agreements

Paragraph 13(b) of each Subscription Agreement states, "The Undersigned may sell its shares of Patron Preferred Stock to one or more existing members of the Cooperative . . ., in each case subject to approval by the Board of Directors."  This provision confers discretion upon the Board, *e.g.*, to grant or deny a grower's request to sell his shares.  As a result, the Board is bound by an implied covenant of good faith and fair dealing.  *See Goodyear*, 86 Wn. App. at 738.  In order to fulfill its implied obligations, the Board must exercise its authority in a manner that is consistent "with the justified expectations" of the SRSC's growers.  *Restatement, supra,* § 205 cmt. a.  Washington appellate courts apply the covenant of good faith and fair dealing in a balanced manner.  As one court explained, while the covenant "casts on each party a duty not to interfere with the other party's performance[,] . . . [i]t does not . . . cast on either party a duty to affirmatively assist in the other party's performance."  *State of Washington v. Trask*, 91 Wn. App. 253, 272-73, 957 P.2d 781, 974 P.2d 1269 (1998).  Applying those principles to the facts of this case, it is clear that the Board did not have a duty to locate SRSC growers who were willing to purchase the plaintiffs' shares.  Nevertheless, the Board's freedom of action was subject to significant constraints.  It could neither unreasonably interfere with

---

[4]The Washington Court of Appeals has quoted part of this definition with approval.  *Frank Coluccio Constr. Co. v. King County*, 136 Wn. App. 751, 766, 150 P.3d 1147 (2007).

ORDER - 27

the plaintiffs' efforts to find suitable buyers, nor could it unreasonably withhold approval of a proposed sale.

The parties disagree with respect to whether the Board acted unreasonably. The plaintiffs allege that the Board denied them access to a list of SRSC growers in eastern Idaho, actively discouraged SRSC growers in eastern Idaho from purchasing their shares, and imposed conditions that made it impossible for them to arrange sales. The defendants dispute each of the plaintiffs' contentions. Furthermore, the defendants allege that they had compelling business reasons for prohibiting the plaintiffs from selling shares to SRSC growers in eastern Idaho. As the plaintiffs note, sugarbeets must be processed. Processing plants have been built in locations that will best serve the largest number of SRSC growers. Allowing a grower in eastern Washington to sell his shares -- *i.e.*, his right to produce sugarbeets -- to a grower in eastern Idaho could result in the underutilization of one processing plant and the overutilization of another. In the defendants' opinion, this could have a disastrous impact upon the Cooperative.

Viewing the record in the light most favorable to the plaintiffs, a rational jury could find that the Board never had any intention of allowing the plaintiffs to sell their shares to growers outside the State of Washington. That does not mean a jury issue exists. The only expectations that the Board was obligated to respect were justifiable ones. The plaintiffs could not have justifiably expected the Board to approve a sale of shares that would damage the SRSC. Thus, unless a rational jury could find that the plaintiffs' attempt

to sell their shares to eastern-Idaho growers would not have harmed the SRSC, the plaintiffs cannot prove that the Board abused its discretion by blocking such sales. As the record now stands, a rational jury could not find for the plaintiffs on this point.

F. Collective Impact

While neither Mr. Burton's alleged comments at the January 5th meeting, nor Mr. Jaro's allegedly false assurances, nor the executive committee's failure to inform the plaintiffs of its decision are individually sufficient to create a jury issue, they are collectively sufficient to create a jury issue with respect to whether the SRSC acted in bad faith by invoking the penalty provisions in the Grower Agreements based upon the plaintiffs' respective failures to plant during 2005.[5]

**CONVERSION (Fourth Cause of Action)**

The plaintiffs' fourth cause of action is a claim for conversion. The law of the States of Washington and Idaho concerning the tort of conversion is in accord. *Compare Western Farm Service, Inc. v. Olsen*, 151 Wn.2d 645, 648 n.1, 90 P.3d 1053 (2004) ("conversion is a willful interference with a chattel without lawful justification, whereby a person entitled thereto is deprived of the possession of it") (internal punctuation and citations omitted), *with Peasley Transfer & Storage Co. v. Smith*, 132 Idaho 732, 743-44, 979 P.2d 605, 616-17 (1999) ("conversion is defined as a distinct act of dominion wrongfully asserted over another's personal property in denial of or inconsistent with rights therein") (citation omitted). Under either

---

[5]This ruling is limited to the 2005 crop year.

ORDER - 29

state's law, the plaintiffs must prove that the SRSC lacked authority to forfeit their shares of stock.  The plaintiffs argue that the SRSC lacked authority because the contractual provision upon which the SRSC relied is an unenforceable liquidated damages clause.

The Washington Supreme Court has adopted a two-part test "to determine whether a liquidated damages clause is enforceable.  First, the amount fixed must be a reasonable forecast of just compensation for the harm that is caused by the breach.  Second, the harm must be such that it is incapable or very difficult of ascertainment." *Walter Implement, Inc. v. Focht*, 107 Wn.2d 553, 559, 730 P.2d 1340 (1987) (citations omitted).  The preceding test is applied as of the time the parties formed the contract.  *Watson v. Ingram*, 124 Wn.2d 845, 851, 881 P.2d 247 (1994).  In other words, it is a "prospective" test.  *Id.* at 850.  The liquidated-damages test adopted by the Idaho Supreme Court differs in at least one important respect.  In Idaho, "parties to a contract may agree upon liquidated damages in anticipation of a breach, in any case where the circumstances are such that accurate determination of the damages would be difficult or impossible, and provided that the liquidated damages fixed by the contract bear a reasonable relation to actual damages." *Graves v. Cupic*, 75 Idaho 451, 456, 272 P.2d 1020, 1023 (1954).  By considering the non-breaching party's actual damages, the Idaho test is at least partially retrospective in nature.  *See Watson*, 124 Wn.2d at 850 ("The question before this court is whether this test is to be applied as of the time of contract formation (prospectively) or as of the time of trial (retrospectively).").  The parties have not addressed the apparent

ORDER - 30

conflict between Washington and Idaho law.  They simply assume that the choice-of-law clause in the Grower Agreements governs; and they may be correct.  *See Erwin*, 161 Wn.2d at 694-700.  In any event, since neither side contests the application of Idaho law, the Court will employ the *Graves* test.

The plaintiffs bear the burden of proving that the forfeiture provision in paragraph 8 is unenforceable.  *Magic Valley Truck Brokers, Inc. v. Meyer*, 133 Idaho 110, 117, 982 P.2d 945, 951 (Ct.App.1999).  They do not appear to dispute that, when they executed their respective Grower Agreements, an accurate determination of damages would have been difficult.  Instead, the plaintiffs focus on the second prong of the *Graves* test; arguing that the forfeiture of their shares of Patron Preferred Stock does not bear a reasonable relationship to the damages that the SRSC actually sustained as a result of their failure to grow sugarbeets during 2005 and 2006.

The plaintiffs submit that the price which they paid for their shares of Patron Preferred Stock -- $400.00 per share -- represents the shares' minimum value.  In the plaintiffs' opinion, the value of their shares vastly exceeds the SRSC's actual damages.  As they point out, the Board demanded $75.00 for each acre of sugarbeets that they did not plant.  Thus, according to the plaintiffs, the SRSC's actual damages are $75.00 per share.  If the values proposed by the plaintiffs are accurate, then the liquidated damages that they have had to pay -- giving up stock worth $400.00 per share -- substantially exceeds the damages that the SRSC has sustained -- $75.00 per share. In other words, the SRSC has reaped an enormous windfall by forfeiting

ORDER - 31

the plaintiffs shares of Patron Preferred Stock.

The SRSC challenges both of the assumptions upon which the plaintiffs' argument is based.  To begin with, the SRSC submits that the price which the plaintiffs paid for their shares of Patron Preferred Stock was an arbitrary number.  In the SRSC's opinion, the $400-per-share figure does not represent the actual value of the shares at the time of purchase.  Rather, according to the SRSC, the figure is simply the price the plaintiffs had to pay for the privilege of joining the SRSC and obtaining the benefits that membership conferred.  Furthermore, the SRSC argues that its actual damages are substantially more than the $75.00 per acre it demanded as a make-whole payment.  That figure, says the SRSC, is hundreds of dollars less per share than the damages the Cooperative actually sustained as a result of the plaintiffs failure to grow sugarbeets during 2005 and 2006.  The SRSC argues that more realistic damage figures are $465 per share for 2005 and $554 per share for 2006.

It is true, as the SRSC argues, that the valuation evidence presented by the plaintiffs is far from overwhelming.  Nevertheless, the fact that the SRSC sold Patron Preferred Stock for $400 per share is some evidence of the shares' value.  Similarly, the fact that the SRSC demanded $75.00 per acre as a make-whole payment is some evidence of the Cooperative's actual damages.  The SRSC vigorously disputes the validity of the plaintiffs' valuation evidence, and the SRSC has submitted valuation evidence of its own.  If the SRSC is correct, not only is the clause enforceable, but the plaintiffs have benefitted financially from forfeiture, as opposed to paying damages.  If the

plaintiffs are correct, the liquidated damages clause is unenforceable.  The dispute between the parties is material to the validity of paragraph 8.  The SRSC is not entitled to summary judgment on this issue.

**ACCOUNTING AND PAYMENT OF PATRONAGE DIVIDENDS (Seventh Cause of Action)**

The plaintiffs have abandoned this claim.  It will be dismissed with prejudice.

**AGRICULTURAL FAIR PRACTICES ACT (Eighth Cause of Action)**

The defendants concede that the plaintiffs are "engaged in the production of agricultural products" within the meaning of the Agricultural Fair Practices Act ("AFPA").  Hence, the plaintiffs qualify as AFPA "producers."  7 U.S.C. § 2302(b).  The defendants further concede that they acquire and process agricultural products from the plaintiffs.  Hence, the defendants qualify as AFPA "handlers."  7 U.S.C. § 2302(a)(1),(2).  The AFPA makes it unlawful for handlers to knowingly "coerce any producer in the exercise of his right to . . . belong to . . . an association of producers," 7 U.S.C. § 2303(a), or to knowingly "coerce or intimidate any producer to . . . cancel, or terminate a membership in or contract with an association of producers[.]"  7 U.S.C. § 2303(c).  The plaintiffs allege that Mr. Burton coerced them into relinquishing their respective memberships in the cooperative by threatening to make it unprofitable for them to grow sugarbeets.

The AFPA does not define the term "coerce."  As a result, the Court must give the word its ordinary and natural meaning.  *See United*

ORDER - 33

*States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447
F.3d 686, 689 (9th Cir.2006).  The Court may determine a word's
ordinary and natural meaning by consulting a dictionary.  *Id.*
Typically, the word "coerce" is defined to mean "compel by force or
threat."  Black's Law Dictionary (8th ed.2004).  The Court may assume
that Congress had this definition, or something similar, in mind when
it enacted the AFPA.  The issue, then, is whether Mr. Burton's alleged
statements were so threatening that objective listeners in the
plaintiffs' position reasonably would have felt compelled to cease
growing sugarbeets.

The plaintiffs rely exclusively upon Mr. Burton's alleged
statements on January 5, 2005.  On that date, he allegedly told the
partners of Sunheaven Farms that the SRSC intended to "collapse" the
Washington district within three years.  This might be accomplished,
suggested Mr. Burton, by requiring them to pay for services that were
then provided by the cooperative at no cost.  The plaintiffs contend
that they were "shocked" and "devastated" by Mr. Burton's statements;
a contention that a rational jury easily could accept.  Moreover, a
rational jury could find that the Sunheaven Farms partners felt
pressured by Mr. Burton's alleged statements.  But pressure is not the
same as coercion.  A rational jury would be unable to find that Mr.
Burton's alleged statements constituted coercion within the meaning of
the AFPA.  To begin with, two of the Sunheaven Farms partners decided
to continue growing sugarbeets despite the pressure applied by Mr.
Burton.  Perhaps this was because the change in policy he described --
*i.e.*, requiring them to pay for services that were then provided by

the cooperative -- was neither imminent nor certain.  At the earliest,
the policy change was three years away.  Not only that, it would
require approval by the board of directors.  The plaintiffs were
represented on the board by Mr. Walker.  They knew or should have
known that they would be entitled to object to any proposed change in
policy, and to suggest alternatives that would enable them to continue
growing sugarbeets.  In view of the preceding circumstances, an
objective person in the plaintiffs' position would have been unable to
conclude during the Winter of 2005 but that he had no choice but to
cease growing sugarbeets.

**PRICE FIXING, RESALE PRICE MAINTENANCE, AND BOYCOTT (Ninth Cause
of Action)**

The plaintiffs have abandoned this claim.  It will be dismissed
with prejudice.

**DEFENDANTS' COUNTERCLAIMS**

The defendants have filed counterclaims against both Bybee Farms
LLC and Duane Munn & Sons Farms LLC.  The defendants seek declaratory
judgments upholding the forfeiture of their shares of Patron Preferred
Stock.  The plaintiffs move for summary judgment.

A. Authority to Impose Reductions

The Articles arguably guarantee each member of the SRSC the right
to "deliver the sugarbeets from one (1) acre of land per share of
Patron Preferred Stock[.]"  (Article IV, § 3, ¶ 2(b), p. 3.[6])  During

---

[6]Paragraph 2(b) states, "The holders of Patron Preferred
Stock shall be entitled . . . to deliver the sugarbeets from one
(1) acre of land per share of Patron Preferred Stock held in

ORDER - 35

both 2004 and 2005, the Board unilaterally limited the number of acres of sugarbeets that the SRSC's members could plant.  The plaintiffs argue that the acreage reductions imposed by the Board were ultra vires.  Under the laws of the States of Washington, Oregon, and Idaho, a shareholder may seek to enjoin an ultra vires corporate action.  RCW 23B.03.040; ORS 60.084; I.C. § 30-1-304.[7]  However, the plaintiffs are not seeking to enjoin the Board's allegedly ultra vires acreage-reduction decisions of 2004 and 2005.  They are seeking to prevent the SRSC from invoking paragraph 8 of the Grower Agreement.  Even assuming the Board's acreage reductions were ultra vires, the SRSC clearly is authorized to enforce Grower Agreements.  (Article III, § 2, p. 1.)  Thus, the act that the plaintiffs seek to prevent is not ultra vires.  The plaintiffs are not entitled to summary judgment on this issue.[8]

---

accordance with the rules and regulations established by the Board of Directors **governing delivery rights and quota as exists from time to time.**"  (Emphasis added.)  The last clause of paragraph 2(b) seems to suggest that the one-acre-of-land-per-share provision is not inflexible; that the Board is authorized to adopt rules modifying "delivery rights and quota[.]"

     [7]All three states have adopted the same section of the Revised Model Business Corporation Act.

     [8]"The term 'ultra vires' . . . is used to describe corporate transactions which are outside the objects for which the corporation was created[.]"  *Twisp Mining & Smelting Co. v. Chelan Mining Co.*, 16 Wn.2d 264, 293-94, 133 P.2d 300 (1943).  Given the purposes for which the SRSC was incorporated, and the powers with which it is endowed, an argument can be made that the SRSC has authority to regulate the number of acres of sugarbeets that its members may plant.  Section 3 of Article IV may limit the SRSC's authority, but the existence of a limit on the SRSC's

B. Antecedent Breaches

The plaintiffs allege that the SRSC breached the relevant Grower Agreements by unilaterally reducing production of sugarbeets during 2004 and 2005. According to the plaintiffs, the Board's decisions infringed their contractual right to grow "one (1) acre of sugarbeets per share [of Patron Preferred Stock]." (Grower Agreement at 1.) In Washington (as in other states), "[a] material breach suspends the injured party's duties until the breaching party cures the default." *Bailie Comm., Ltd. v. Trend Business Systems*, 53 Wn. App. 77, 81, 765 P.2d 339 (1988) (citing *Restatement (Second) of Contracts* §§ 237, 241 (1981)). Consequently, if the Board's acreage reductions materially breached the relevant Grower Agreements, the plaintiffs may have been relieved of their duty to plant sugarbeets.[9]

Whether a breach is material is a question of fact. *TMT Bear Creek Shopping Ctr., Inc. v. PETCO Animal Supplies, Inc.*, 140 Wn. App. 191, 209, 165 P.3d 1271 (2007). Section 241 of the *Restatement* lists

authority does not necessarily mean that the Board's acreage reductions were ultra vires. *Cf. Hartstene Pointe Maintenance Ass'n v. Diehl*, 95 Wn. App. 339, 345, 979 P.2d 854 (1999) (distinguishing between a challenge to the existence of corporate authority and a challenge to the manner in which a corporation exercises its authority).

[9]The Grower Agreement contains a choice of law clause. The Court need not decide whether the clause is effective unless there is an actual conflict between Washington and Idaho law. *Erwin*, 161 Wn.2d at 692. Although the Idaho Supreme Court may not have adopted sections 237 and 241, it is well established that "one cannot declare a forfeiture of a contract where he himself is materially in default." *Barnard & Sons, Inc. v. Akins*, 109 Idaho 466, 708 P.2d 871 (1985).

ORDER - 37

five circumstances that are relevant to a determination of
materiality:

> (a) the extent to which the injured party will be
> deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be
> adequately compensated for the part of that benefit of which
> he will be deprived;
> (c) the extent to which the party failing to perform or
> to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or
> to offer to perform will cure his failure, taking account of
> all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party
> failing to perform or to offer to perform comports with
> standards of good faith and fair dealing.

*Restatement, supra*, § 241.[10]

The parties disagree with respect to whether the 2004 and 2005
acreage reductions deprived the plaintiffs of benefits.  The
plaintiffs point out that they were not allowed to plant one acre of
sugarbeets for each share of Patron Preferred Stock they held.  In
response, the defendants submit that the acreage reduction was
necessary to keep the SRSC operating profitably.

Assuming, for purposes of argument, that the acreage reductions
deprived the plaintiffs of benefits, their loss was small when
compared to the payments which they received from the SRSC for the
sugarbeets they delivered.  Furthermore, the plaintiffs may bring an
action for damages to recover any benefits they lost as a result of

---

[10]The Washington Court of Appeals has approved use of the
above-quoted factors.  *TMT Bear Creek Shopping Ctr., Inc.*, 140
Wn. App. at 209 and n.8.

ORDER - 38

the SRSC's alleged breach.  A damage award should fully compensate them.

"A material failure by one party gives the other party the right to withhold further performance as a means of securing his expectation of an exchange of performances."  *Restatement, supra*, § 241, cmt. e. The plaintiffs planted sugarbeets during 2004 despite the Board's decision to impose a 5% acreage reduction.  The SRSC paid the plaintiffs for the sugarbeets they delivered.  There is no evidence that, as the 2005 planting season approached, the plaintiffs thought that the SRSC was breaching the Grower Agreements by limiting production.  Nor is there any evidence that the plaintiffs refrained from planting sugarbeets during 2005 in order to secure their expectations under the Grower Agreements.  To the contrary, it is undisputed that their decision to refrain from planting was based upon entirely unrelated considerations.  Furthermore, if the plaintiffs had planted sugarbeets during 2005, there is every reason to think the SRSC would have paid them for the sugarbeets they delivered.  In other words, the plaintiffs' expectations under their respective Grower Agreements were reasonably secure during 2005 despite the acreage reductions.  The plaintiffs' failure to plant during 2005 did not increase their security.  If anything, it undermined their security. *See id.* ("To the extent that [the injured party's] expectation is already reasonably secure, in spite of the failure [of the breaching party to perform], there is less reason to conclude that the [breaching party's] failure is material.").

The final circumstance is the presence or absence of good faith

or fair dealing.  Although a party to a contract may, in good faith, fail to perform a duty and breach the agreement, "[t]he extent to which the behavior of the party failing to perform . . . comports with standards of good faith and fair dealing is . . . a significant circumstance in determining whether the failure is material."  *Restatement, supra*, § 241, cmt f.  The Board claims it imposed acreage reductions in an effort to maintain the financial health of the Cooperative.  Moreover, the Board did not single out the plaintiffs; the reductions applied to all SRSC sugarbeet growers.

No one of the preceding factors is dispositive in determining whether the SRSC's alleged breaches of the Grower Agreements were material.  Upon weighing all of the factors, a rational jury could find that the SRSC's alleged breaches were not material.  By way of example only, the jury might be persuaded by evidence that, during 2004 and 2005, the plaintiffs did not perceive the acreage reductions as breaches; did not think that the reductions threatened their expectations under the Grower Agreements; and did not refrain from planting in order to secure performance by the SRSC.  It follows that the plaintiffs are not entitled to summary judgment on this issue.

C. Liquidated Damages

As explained above, the plaintiffs allege that paragraph 8 of the Grower Agreements is an unenforceable liquidated damages clause.  *See supra* pp. 29-33.  Just as the SRSC is not entitled to summary judgment on this issue, neither are the plaintiffs.

**SUMMARY**

The plaintiffs may proceed to trial upon their causes of action

for promissory estoppel (first), breach of the covenant of good faith and fair dealing (third), and conversion (fourth). At a minimum, the plaintiffs' remaining claims raise the following issues: (1) whether Mr. Burton promised the plaintiffs that the SRSC would purchase their shares of patron preferred stock at a reasonable price if they ceased growing sugarbeets during 2005, (2) whether Mr. Burton's alleged promise is actionable under the doctrine of promissory estoppel, (3) whether Mr. Burton had apparent authority to make the promise alleged by the plaintiffs, (4) whether Mr. Jaro made the statements attributed to him by Brandon Munn, (5) whether Mr. Jaro's alleged statements constituted a promise on the part of the SRSC to refrain from demanding make-whole payments with respect to the 2005 crop until a purchase-sale agreement was executed, (6) whether the SRSC acted in bad faith by invoking the penalty provisions in the Grower Agreements based upon the plaintiffs' failure to plant sugarbeets during 2005, and (7) whether the SRSC had authority to forfeit the plaintiffs' respective shares of patron preferred stock. The preceding issues and claims are not the only ones that remain to be resolved. The SRSC seeks declaratory judgments upholding its forfeiture of the plaintiffs' respective shares of stock. At a minimum, the SRSC's counterclaims raise issues with respect to whether paragraph 8 of the Grower Agreements is an enforceable liquidated damages clause.

**IT IS HEREBY ORDERED:**

1. The defendants' motion for partial summary judgment with respect to the plaintiffs' first and second causes of action (**Ct. Rec. 166**) is **denied** in part and **granted** in part:

(a) The defendants' motion to dismiss the plaintiffs' promissory estoppel claim (first cause of action) is **denied.**

(b) The defendants' motion to dismiss the plaintiffs' unjust enrichment claim (second cause of action) is **granted.**

2. The defendants' motion for partial summary judgment with respect to the plaintiffs' third, fourth, seventh, and eight causes of action (**Ct. Rec. 167**) is **denied** in part, **reserved** in part, and **granted** in part:

(a) The defendants' motion to dismiss the plaintiffs' claim for breach of the covenant of good faith and fair dealing (third cause of action) is **denied.**

(b) The Court **reserves ruling** with respect to the defendants' motion to dismiss the plaintiffs' claim for conversion (fourth cause of action).  The defendants may renew this motion at the conclusion of the plaintiffs' case in chief.

(c) The defendants' motion to dismiss the plaintiffs' claim for Accounting and Payment of Patronage Dividends (Seventh Cause of Action) is **granted.**

(d) The defendants' motion to dismiss the plaintiffs' claim for violation of the Agricultural Fair Practices Act (Eighth Cause of Action) is **granted.**

3. The defendants' motion for partial summary judgment with respect to the plaintiffs' ninth cause of action (Price Fixing, Resale Price Maintenance, and Boycott) (**Ct. Rec. 168**) is **granted.**

4. The plaintiffs' motion to dismiss the defendants' counterclaims (**Ct. Rec. 188**) is **denied.**

ORDER - 42

5. The plaintiffs' motion to strike (**Ct. Rec. 230**) is **denied** as moot.

6. The defendants' motion to strike (**Ct. Rec. 238**) is **denied** as moot.

7. The plaintiffs' motion to strike (**Ct. Rec. 272**) is **denied** as moot.

8. The defendants' motion in limine (**Ct. Rec. 279**) is **denied** with leave to refile as needed.

9. The plaintiffs' motion in limine (**Ct. Rec. 282**) is **denied** with leave to refile as needed.

10. The plaintiffs' motion in limine (**Ct. Rec. 284**) is **denied** with leave to refile as needed.

11. Within the next seven days, the Court will notify counsel of the date and time for a scheduling conference.

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to enter this order and furnish copies to counsel.

**DATED** this ___29th___ day of September, 2008.

          ___s/Fred Van Sickle___
                Fred Van Sickle
        Senior United States District Judge

ORDER - 43